Clyde Jack BASS, Appellee,

v.

Crispus C. NIX, Appellant.

Clyde Jack BASS, Appellant,

v.

Crispus C. NIX, Appellee.

Nos. 89–2375, 89–2490.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1990.

Decided July 17, 1990.

Thomas D. McGrane, Des Moines, Iowa, for appellant.

Paul H. Rosenberg, Des Moines, Iowa, for appellee.

Before LAY, Chief Judge, HEANEY and TIMBERS,* Senior Circuit Judges.

HEANEY, Senior Circuit Judge.

Clyde Jack Bass, an admitted thief, was convicted of the murder of Billy Grimm. On habeas, Bass argued that his right to remain silent while in custody was violated at trial under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The district court agreed. We affirm.

## BACKGROUND

On the evening of June 11, 1978, the body of Billy Norman Grimm was pulled from a burning room at the Holiday Inn, Des Moines, by Arlan Main, a guest at the motel.[1] Main could not say precisely what time it was when he discovered the blaze, but he was sure that it was still daylight when he heard an explosion and found Room 151 engulfed in fire.[2]

---

* The Honorable William H. Timbers, United States Senior Circuit Judge for the Court of Appeals for the Second Circuit, sitting by designation.

1. Expert medical and firearms testimony established that Grimm had died prior to the blaze as a result of four gunshot wounds to the head and upper body inflicted by a .38 caliber weapon.

2. A meteorologist testified that the sun set on the night of Grimm's death at 8:54 p.m. The meteorologist also testified that there is atmo-

Police and firefighters arrived on the scene shortly after 9:00 p.m. and subsequently combed through the gutted motel room and found firearms, ammunition, and jewelry. The fire inspector testified that the fire was deliberately set by means of a flammable substance, probably gasoline.

Motel records indicate that someone from Room 151 made two calls that day to Richard and Colleen Webb, Bass' aunt and uncle, who lived near Des Moines. The other numbers called belonged to Bass' girlfriend and her father. The Webbs testified that neither call, including the call at 8:32 p.m. the night of the murder, was made by Bass. Bass' girlfriend testified that the call to her was made by Grimm, also a close friend of hers.

A motel employee, Steven Murray, stated at trial that he saw Bass with Grimm several times that day, the latest being between 6:00 and 7:00 p.m.[3]

A firearms expert examined the slugs recovered from Grimm's body and testified that due to the weight and "nomenclature" of the bullets, they were .38 caliber Smith & Wesson class lead bullets fired from a firearm having "five land and grooves with a righthand twist." He also testified that none of the weapons found in Room 151 could have been used to kill Grimm.

A gas station attendant testified that a person in an Oldsmobile with California license plates drove into his station several blocks north of the Holiday Inn on the evening of the murder to buy a gas can and fill it with gas. The attendant identified this person as Bass from a photo array. At a line-up, however, he identified a Polk County deputy sheriff as the person who bought the gas can.

About two weeks after the murder, Bass' automobile and suitcases were found several miles from his aunt and uncle's home.[4]

Bass testified at trial that he and Grimm were longtime friends and career thieves. In late May or early June 1978, Bass and Grimm left their homes in California in Bass' car to "pull a job" in Las Vegas. After the job, Grimm drove alone to Des Moines to fence the stolen property, and Bass flew there later to meet Grimm. They stayed together in Room 151, but on the day of the murder, Bass left to visit his aunt and uncle at their lake home outside of Des Moines. When he found his aunt and uncle not at home, he went to the other side of the lake to visit another uncle, Wilford Thomas. He stayed with Thomas until 9:00 p.m., when he started back to Des Moines.

Bass also testified that upon returning to the Holiday Inn, he discovered the fire and death of Grimm. He then went back to Thomas for help. He abandoned his car, went to Chicago and took a plane to California, where he evaded police until April 1979. At that time, the State of California arrested Bass both for the murder of Grimm and charges related to his "profession."[5]

spheric reflection of sunlight after sunset so that darkness would not occur until 9:30.

3. There is evidence in the record to indicate that Murray's last contact with either Bass or Grimm was between 4:30 p.m. and 5:00 p.m. In addition, Murray testified that the person he saw with Grimm had a tattoo located on the upper part of his arm. At the request of the state, Bass exposed his arms, and there was no tattoo. Finally, Des Moines investigators presented Murray with a photo array on the day after the murder. Murray identified someone other than Bass as the person he saw with Grimm. Four days later, Murray was shown a different array, from which he identified Bass.

4. The state's theory at trial was that Bass shot Grimm with a stolen gun of which he then disposed. Bass' theory at trial, in addition to an alibi defense, was that the individuals, "some other bad guys," to whom Grimm was trying to sell the stolen merchandise committed the murder. A third possibility, because Grimm was seen having several drinks in the lounge before the murder, is that Grimm "fought a few rounds with original sin in the Paradise Lounge of the Holiday Inn."

5. Upon his arrest, the authorities read Bass his *Miranda* rights. After a series of legal maneuvers among Bass, the State of California, and the State of Iowa lasting over a period of two years, Iowa authorities went to California and escorted Bass by plane to Iowa. During the trip back to Iowa, Bass and the officers communicated about the murder of Grimm. For example, Bass asked, since they claimed to know that he had murdered Grimm, what were he and Grimm doing together in Des Moines? He did

During his cross-examination of Bass, the prosecutor asked the following question to which Bass responded.

Q. Mr. Bass, isn't true that this whole time from June 11, 1978, until today, October 12th, 1982, this is the very first time that you have ever told this story about somebody—the bad guys shooting Billy [Grimm], or the—

A. I never said anybody shot him.

Bass' counsel objected and moved, on the basis of *Doyle*, for a mistrial. The trial court overruled the objection because it found the question not to involve Bass' right to remain silent when in custody and therefore denied Bass' motion for a mistrial. Later in his cross-examination of Bass, the prosecutor asked further questions about Bass' post-arrest and pre-arrest silence.[6]

During his closing argument, the prosecutor argued the following about Bass' explanation at trial as to the murder:

He gave you on the stand his self-serving story that he could have given on June 12th, [the day after the murder,] that he could have given on the 25th of February '81, [the day that Des Moines' officers escorted him back for trial.] And he gave you his self-serving statement finally on October 12, '82, [the day of closing arguments.] His story is ridiculous.

The jury returned a verdict of guilty of first-degree murder. Bass was sentenced to life imprisonment.

---

not, however, offer any exculpatory or inculpatory explanation or evidence.

**6.** The prosecutor's first question regarding Bass' silence was on page 571 of the transcript. On page 607 of the transcript, the following colloquy took place:

Q. Mr. Bass, it's true, isn't it, that you never told anyone, specifically the Des Moines Police Department, the version of events which you testified to here this morning after June 11th, 1978, until when you were picked up on February 25th, '81?

A. No.

Q. And it's true that nobody stopped you from going to a phone anywhere in the United States and telling those facts, isn't that true?

A. I did make a telephone call, but I didn't call the Des Moines police force.

On direct appeal, the Iowa Supreme Court held that the rule set forth in *Doyle* was not violated.

> *Doyle* does not control this case, however, because Bass did not exercise his *Miranda* rights and maintain post-arrest silence in reliance on that warning.
>
> [T]he *Doyle* rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings.

*United States v. Crowder*, 719 F.2d 166, 172 (6th Cir.1983).

.    .    .    .    .

We note that the Court in *Doyle* was concerned with protecting a defendant's post-arrest *Miranda* warning silence. But, where, as here, defendant disregards his right to remain silent and openly and voluntarily engages in conversation about the events leading up to his arrest, including a general denial of his guilt, the concern for preserving the constitutional protections of one who has relied on such protections is no longer present.

*State v. Bass*, 349 N.W.2d 498, 503 (Iowa 1984).

On habeas, the district court granted Bass' petition. It disagreed with the Iowa Supreme Court's conclusion that Bass waived his right to remain silent.

> Yet, nothing in the record supports the conclusion that petitioner waived his right to remain silent about his role in

Q. Okay. Who did you call?

A. I called Don Grimm.

Q. That's the victim's brother?

A. Yes.

Q. And he lived in Albuquerque?

A. Yes.

Q. And specifically anywhere in the entire United States you didn't pick up the phone and call the Des Moines Police Department and tell anything about Billy from June 11th, '78, until February 25th, '81?

A. No, I didn't.

While these questions refer to pre-arrest silence, they also explicitly refer to post-arrest conduct—Bass was arrested for this murder as well as other charges in April 1979.

the offense itself. A suspect who wishes to exercise his right to remain silent need not remain mute. A suspect does not waive his right to remain silent by engaging in a conversation about the weather with an officer. Likewise, a suspect does not waive his right to remain silent by asking the officer about the crime with which he has been charged. A suspect waives his right to remain silent, for purposes of the fifth amendment, when the suspect discusses his role in the offense or offers an exculpatory story or alibi.

*Bass v. Nix*, No. 85–707, slip op. at 22 (S.D.Iowa July 14, 1989). The district court then held that Bass' claim was distinguishable from the claim in *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), and that this error was not harmless, in part, because the trial court characterized the state's case against Bass as "meager." [7]

## DISCUSSION

On appeal, the state argues that this case is controlled by *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), and *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), rather than *Doyle*.

In *Doyle*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment of the Constitution prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings or a defendant's post-arrest silence. That case involved two defendants who made no exculpatory or inculpatory post-arrest statements.[8] Each testified at trial that he had been framed. On cross-examination, the prosecutor asked the defendants why they had not told the story about being framed to the police upon arrest. The Supreme Court concluded that it was "fundamentally unfair" to allow the jury to draw an inference of guilt from a defendant's silence that was in response to *Miranda* warnings. *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245.

> Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.

*Id.* at 617, 96 S.Ct. at 2244.

In *Anderson v. Charles*, the police arrested the defendant for murder after discovering him in the victim's automobile. The defendant, shortly after being given *Miranda* warnings, told a police detective that he had stolen the automobile from a location some two miles from the bus station. At trial, the defendant testified that he took the automobile from a parking lot directly across the street from the bus station. On cross-examination, the prosecutor first asked a general question regarding why the defendant at the time of the arrest did not tell anybody where he stole the automobile. The prosecutor then asked the defendant why he told the arresting officer

---

7. The district court also factored the prosecutor's cavalier attitude towards Bass' constitutional rights into its harmless error calculus.

> [T]he prosecutor knew that Clyde Jack Bass had a right to remain silent and that Bass's attorney would have advised him of this. The prosecutor knew that Bass could continue to elect to remain silent during trial and his silence could not be used against him; and he knew that Bass could elect to testify and his silence prior to trial was not probative. Yet, the prosecutor deliberately or recklessly chose to invite the jury to draw adverse inferences from this period of silence by means of his improper comment. The prosecutor chose to avail himself of the "significant potential of evidence" to bolster the prosecutor's case.
>
> Although persons experienced in our adversarial criminal justice system might assign little probative weight to such silence, a lay jury would likely attach significant weight to such silence. The prosecutor availed himself of the benefits of such prejudice. As a result, it is arguable that Clyde Jack Bass was severely penalized for electing to exercise his Fifth Amendment constitutional right to remain silent.

*Bass v. Nix*, No. 85–707, slip op. at 26 (S.D.Iowa July 14, 1989).

8. One defendant said nothing at all. The other, upon being arrested, asked the officers, "What's this all about?" When told the reason for his arrest, the defendant stated, "you got to be crazy," or "I don't know what you are talking about." None of these statements contradicted the defendant's later trial testimony.

a different story as to where he found the automobile. The Sixth Circuit, separating the two questions, held the first question to violate the *Doyle* rule. The Supreme Court reversed.

> We do not believe that the cross-examination in this case can be bifurcated so neatly. The quoted colloquy, taken as a whole, does "not refe(r) to the [defendant's] exercise of his right to remain silent; rather (it asks) the [defendant] why, if (his trial testimony) were true, he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling that he took it from the street." Any ambiguity in the prosecutor's initial questioning was quickly resolved by explicit reference to [the detective's] testimony, which the jury had heard only a few hours before. The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement.

*Anderson v. Charles,* 447 U.S. at 408–09, 100 S.Ct. at 2182 (quoting *People v. Charles,* 58 Mich.App. 371, 227 N.W.2d 348, 354 (1975)) (parentheses were brackets in original).

In *Jenkins v. Anderson,* the prosecutor attempted to impeach the defendant's credibility by questioning the defendant regarding his silence before he was taken into custody and given *Miranda* warnings. The Supreme Court found no constitutional violation.

> In this case, no governmental action induced [the defendant] to remain silent before arrest. The failure to speak occurred before the [defendant] was taken into custody and given Miranda warnings. Consequently, the fundamental unfairness present in Doyle is not present in this case. We hold that impeachment by use of prearrest silence does not violate the Fourteenth Amendment.

*Jenkins v. Anderson,* 447 U.S. at 240, 100 S.Ct. at 2130.

■ The facts of the instant case indicate that the outcome of this appeal is controlled by *Doyle.* Here, the prosecutor's question was designed,[9] and so functioned, to impeach Bass' trial testimony by reference to his post-arrest silence. The prosecutor did not refer to any prior inconsistent statements at that point, or at any later point in his cross-examination. Moreover, the record indicates that Bass made no prior inconsistent statements that could have impeached his trial testimony.

■ The state's argument that any references to post-arrest silence were cured by concurrent references to pre-arrest silence is unpersuasive. Unlike the prosecutor in *Anderson v. Charles,* the prosecutor here did not "quickly resolve[ ] by explicit reference" to silence prior to arrest any impermissible inferences from a *Doyle* violation. The original question, as well as the later questions, set forth a specific period of time, over two-thirds of which Bass spent in custody and under arrest for the murder of Grimm. The same can be said of the prosecutor's statement during closing argument.

The state's reliance on *Hockenbury v. Sowders,* 718 F.2d 155 (6th Cir.1983), *United States v. Ochoa–Sanchez,* 676 F.2d 1283 (9th Cir.1982), and *Grieco v. Hall,* 641 F.2d 1029 (1st Cir.1981), is misplaced. In each of these cases, the defendant told arresting officers an exculpatory story that explicitly or implicitly contradicted the defendant's later trial testimony.

In *Hockenbury,* the defendant first told arresting officers that he was in Utah at the time of the crime. He later told arresting officers that he was in the town where the crime took place but could not remember where in that town he was. At trial, he testified that he was at a particular place with particular people. On cross-examination, the prosecutor asked the defendant

---

9. The prosecutor repeatedly stated that his goal was to impeach Bass' trial testimony by reference to his post-arrest silence and not by reference to a specific post-arrest statement. *See, e.g.,* Trial Transcript at 574. In so doing, the prosecutor relied on *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the holding of which he misrepresented to the trial court. *Id.* at 573.

why he did not inform the arresting officers of these particularities. The Sixth Circuit found that the defendant's post-arrest statements contradicted his trial testimony and that the prosecutor's questions and closing argument referred specifically to those inconsistent post-arrest statements. *Hockenbury*, 718 F.2d at 159. The Sixth Circuit reasoned, as did the Supreme Court in *Anderson v. Charles*, that because the questions, as well as closing argument, were not intended and did not, in fact, draw meaning from the defendant's silence, no *Doyle* violation had occurred. *Id.*

In *Ochoa–Sanchez*, the defendant was arrested for driving across the border in an automobile containing heroin. He told the officers that he borrowed the car from a friend, whom the defendant identified and described in great detail. He did not, however, indicate that this friend was involved in the crime. At trial, the defendant testified that he was set up by this friend. On cross-examination, the prosecutor asked several questions relating to why, since he had told the arresting officers so much about the friend, he did not tell the officers that this friend had set him up. In affirming the conviction, the Ninth Circuit stated:

> The trial transcript reveals that defendant's version of the events of his trip into and return from Mexico is quite different from the version he proposed to [the agent] upon his arrest. When he was arrested he claimed that he had borrowed the car from a friend who lived in Santa Ana, that he had driven to Tijuana to visit a friend, and that he was returning. At trial, he asserted that he had hesitatingly accompanied two specific acquaintances to a bar in Tijuana and had assumed control of the car only a short time before. Several other portions of his trial testimony arguably are inconsistent with his post-arrest statements, but they need not be described in detail. It is sufficient if the statements,

taken as a whole, reveal an inconsistency.

> Moreover, we do not believe that the prosecutor was attempting to draw meaning from the defendant's silence. The questioning clearly related specifically to details that defendant offered at trial but failed to reveal at the time of his arrest. As in *Charles*, the questions, by focusing on [the agent's] testimony, resolved any potential ambiguity. "The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement."

*Ochoa–Sanchez*, 676 F.2d at 1286–87 (citing *Anderson v. Charles*, 447 U.S. at 408–09, 100 S.Ct. at 2182).[10]

In *Grieco*, the defendant was arrested outside a vehicle that the police had been chasing from the scene of a robbery. The arresting officers took the stand and testified that the defendant stated in custody that he did not know the owner of the getaway vehicle and that he was a hitchhiker. The defendant took the stand and testified that he told the officers in response to their questions that he did not know who was driving the vehicle but that he had seen somebody run out of the vehicle, although it was too dark to make an identification. He also testified that he was merely urinating behind the building where the vehicle stopped. On cross-examination, the prosecutor asked the defendant why he did not tell the officers that he was just urinating. The prosecutor followed up on this question during closing argument. The First Circuit stated:

> In the case at bar, the district court ruled that the trial court had not committed error in allowing the cross-examination questioning in part because the "petitioner's direct testimony could arguably have created an inference that he had

---

**10.** The dissent in *Ochoa–Sanchez* merits some attention. The dissent argues that the prosecutor's questions and closing argument did attempt to draw meaning to the defendant's silence. *Ochoa–Sanchez*, 676 F.2d at 1289–91 (Fletcher, C.J., dissenting). Whether that char-

acterization of the facts or the majority's characterization is accurate is irrelevant to our inquiry because, without a doubt, the prosecutor in the instant case was attempting to and did, in fact, draw meaning from Bass' silence.

been cooperating with the police." However, we cannot uphold an interpretation of the facts in this case which would allow the exception to swallow the rule. *Grieco*, 641 F.2d at 1033–34. The court, however, continued and stated that the defendant's exculpatory trial story regarding the urinating behind the building "clearly was inconsistent with his post-arrest statement that he was a hitchhiker." *Id.* at 1036. On that basis, it held that the prosecutor's comments fell outside the scope of *Doyle.*

Our review of the evidence indicates that Bass made no post-arrest statements that could be fairly construed to conflict with his trial testimony. Furthermore, there were no omissions, from what statements Bass did make, of the type considered in *Ochoa–Sanchez* that conflict in any manner with his trial testimony. In sum, Bass' only relevant post-arrest conduct was his silence.[11] The only evidentiary purpose for the prosecutor's questions and statement was "to draw meaning" from Bass' silence and not to elicit an explanation for a prior inconsistent statement. *See Charles v. Anderson*, 447 U.S. at 409, 100 S.Ct. at 2182.

■ We also disagree with the Iowa Supreme Court's conclusion that merely by engaging the officers on the airplane back to Iowa from California in conversation, Bass waived his right to due process as set forth in *Doyle.* The Iowa Supreme Court's

conclusion does not square with the facts of *Doyle.* In *Doyle*, one of the defendants made several comments to arresting officers about the crime.[12] Yet, the Supreme Court held that cross-examination in an attempt to impeach that defendant through his post-arrest silence was unconstitutional. Furthermore, the Supreme Court has never applied the waiver doctrine to a *Doyle* violation.[13] The key to the inquiry has always been whether the impeachment was based on post-arrest statements contradicting later trial testimony or whether the impeachment was based on silence contradicting later trial testimony. *United States v. De-Vore*, 839 F.2d 1330, 1331–32 (8th Cir.1988). *Doyle* applies when, as in the instant case, the impeachment was based on silence.

■ The question now becomes whether the prosecutor's impermissible references to Bass' post-arrest silence were sufficiently prejudicial to justify reversal. The Supreme Court has not delineated the standard of review for evaluating the prejudicial effect of a *Doyle* violation. *See Greer v. Miller*, 483 U.S. 756, 761 n. 3, 107 S.Ct. 3102, 3106–07 n. 3, 97 L.Ed.2d 618 (1987) (ultimately holding that no *Doyle* violation had occurred). The Eighth Circuit applies the harmless-beyond-a-reasonable-doubt standard to *Doyle* violations. *See, e.g., Clark v. Wood*, 823 F.2d 1241, 1247 (8th Cir.1987); *United States v. Disbrow*, 768 F.2d 976, 980 (8th Cir.1985); *see also Miller v. Greer*, 789 F.2d 438, 443 (7th

---

11. As noted by the Iowa Supreme Court, Bass' statements to the officers on the flight were limited to some questions about the murder, a statement asking if the Iowa authorities were so smart why were Bass and Grimm in Des Moines, and a general denial of guilt. None of these statements contradicted Bass' trial testimony. Furthermore, the statements are *not* of the same character, neither exculpatory nor inculpatory, as statements identified by the Supreme Court or the Courts of Appeals as falling outside the scope of *Doyle. See, e.g., Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980); *United States v. Crowder*, 719 F.2d 166 (6th Cir.1983).

12. A later Supreme Court decision noted that one of the defendants in *Doyle* was not com-

pletely silent. *Anderson v. Charles*, 447 U.S. at 407 n. 2, 100 S.Ct. at 2182 n. 2.

13. While some of the reasoning in *United States v. Crowder*, 719 F.2d 166 (6th Cir.1983), may support the proposition that a defendant can surrender his or her due process rights set forth in *Doyle* by means of waiver, the facts of that case are inapposite to the issue raised here. In *Crowder*, the defendant gave arresting officers a full exculpatory explanation of his conduct. At trial, the prosecutor only referred to the defendant's post-arrest silence in an effort to demonstrate that the defendant had stuck by the same story from the moment he was arrested until he testified at trial. To interpret *Crowder* as the State of Iowa requests would allow an exception to the *Doyle* rule to swallow the *Doyle* rule but

Cir.1986) (harmless error standard applied by all Circuits),[14] *rev'd on other grounds*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), and cases cited therein.

The key factors in determining whether a *Doyle* violation is harmless under the above standard are whether the government made repeated *Doyle* violations, whether any curative effort was made by the trial court, whether the defendant's exculpatory evidence is "transparently frivolous," and whether the other evidence of the defendant's guilt is "otherwise overwhelming." *United States v. Shaw*, 701 F.2d 367, 382 (5th Cir.1983). Here, the trial court overruled Bass' objection to the prosecutor's first *Doyle* violation. Later in his cross-examination of Bass, the prosecutor made two more *Doyle* violations. In his closing argument, the prosecutor commented on Bass' post-arrest silence and cemented his earlier comments.[15] The trial court did not submit any instructions to the jury to mitigate the damage caused by the *Doyle* violations. While there is evidence in support of the verdict of guilty, the government's case, as the state trial court

noted, was meager. Bass' evidence contradicted all the witnesses who gave evidence as to his presence at the scene. Bass' theory of the murder—Grimm was killed by those individuals to whom they sought to sell the stolen property—is not, in light of the evidence presented at trial, "transparently frivolous." Neither is his alibi that he was with a relative outside of Des Moines. This alibi was corroborated by other witnesses. In light of all the circumstances, we hold that the prosecutor's violations of the *Doyle* rule were not harmless beyond a reasonable doubt.

Accordingly, the decision of the district court is affirmed.[16]

---

for those few instances where the defendant remains completely mute.

**14.** Judge Easterbrook dissented from the Seventh Circuit's en banc decision that the harmless error standard applies to *Doyle* violations. *Miller v. Greer*, 789 F.2d 438, 448 (7th Cir.1986) (Easterbrook, J., dissenting). He argued, because the *Doyle* rule is prophylactic rather truthfinding, because review in that instance was collateral rather than direct, because the defendant in that case failed to object, and because the trial court cut short the prosecutor's attempted *Doyle* violation, that review of *Doyle* violations should apply the actual prejudice standard rather than the harmless error standard. We disagree with Judge Easterbrook both under the unique facts of this case and in general. In specific, unlike the defendant in *Miller v. Greer*, Bass objected to the prosecutor's *Doyle* violation. Furthermore, while the trial court asked the prosecutor not to infringe upon Bass' rights under *Doyle*, it did not sustain Bass' objection or give a curative instruction, and the prosecutor made three more comments on Bass' post-arrest silence—two later in cross-examination and one during closing arguments.

More importantly, we disagree with Judge Easterbrook's interpretation of the *Doyle* rule as

prophylactic rather than truth-finding. He argues that the essence of the *Doyle* rule is not that a defendant's silence in response to *Miranda* warnings and custody will mislead the jury, but rather the *Doyle* rule rests on the "vice of the double-cross." *Id.* at 449. By defining the issue in this manner, he ignores—without adequate explanation—the Supreme Court's conclusion that silence as a consequence of *Miranda* warnings is "insolubly ambiguous," *Doyle*, 426 U.S. at 617, 96 S.Ct. at 2244, and relies on pre-arrest silence cases. Because we believe that the *Doyle* rule is, at its heart, concerned with the ability of the adversarial system to find the truth, we apply the harmless-beyond-a-reasonable-doubt standard.

**15.** We agree with the district court that the state's argument that the later comments refer only to pre-arrest silence is without basis in the record. *Bass v. Nix*, No. 85–707, slip op. at 24. We also agree with the district court's observation that the prosecutor deliberately or recklessly chose to invite the jury to draw adverse inferences from Bass' post-arrest silence by means of improper comment. *Id.* at 26.

**16.** Because of the result reached, we do not reach the other issues raised by the parties.