Kenneth A. **FIELDS**, Appellant,

v.

Walter **LEAPLEY**, Warden, South Dakota State Penitentiary; **Mark W. Barnett**, Attorney General, State of South Dakota, Appellees.

No. 93–3034.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1994.

Decided July 26, 1994.

---

Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MAGNUSON,* District Judge.

MAGILL, Circuit Judge.

Kenneth A. Fields appeals the district court's denial of his petition for habeas corpus under 28 U.S.C. § 2254 (1988). Fields argues that the prosecutor at his trial violated his Fourteenth Amendment due process rights by commenting on his post-arrest, post-*Miranda* warnings silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). For reversal, Fields argues that the district court applied an improper standard to determine whether the *Doyle* violations merit reversal. We agree and reverse the district court's denial of habeas relief.

## I. BACKGROUND

Early in the morning of October 21, 1990, Fields stabbed and killed Scott Fodness outside the Pomp Room Bar (Pomp Room) in Sioux Falls, South Dakota. Fodness, who was a bouncer at the Pomp Room, was 23 years old and 6 feet 1 inch tall, weighed between 240 and 260 pounds, and had been an all-state wrestler in high school. Fields was 5 feet 10 inches tall and weighed about 145 pounds. The stabbing was the culmination of a barroom brawl that had spilled out onto the street outside the Pomp Room. The police immediately arrested Fields and informed him of his *Miranda* rights. That night, the police conducted two interviews with Fields regarding the events surrounding the stabbing. Fields told Officer Lance Mattson and later Detective Marc Norlin that Fodness was "trying to cause bodily harm" and that he simply acted in self-defense. Fields, however, refused to discuss the actual stabbing. The police taped and later transcribed the two interviews.

On October 25, 1990, a Minnehaha County grand jury issued an indictment charging Fields with one count of first-degree murder, S.D. Codified Laws § 22–16–4 (1988), and one count of first-degree manslaughter, *id.*

Stephen Miller, Sioux Falls, SD, argued, for appellant.

Gary Campbell, Pierre, SD, argued, for appellees.

* THE HONORABLE PAUL A. MAGNUSON, United States District Judge for the District of Minnesota, sitting by designation.

§ 22–16–15. On March 5, 1991, Fields' jury trial began. Fields did not dispute that he had stabbed and killed Fodness, but claimed that he acted in self-defense.[1] The government's theory of the case was that Fodness was simply removing Fields from the Pomp Room when Fields stabbed him to death. At trial, the government and Fields called numerous witnesses to testify regarding the barroom brawl, the stabbing, and Fields' subsequent arrest.

We first recount the events leading up to the initial brawl which are largely undisputed. Dan Padovani and Wayne Crafton, who worked with Fields, picked up Fields at 8 p.m. on October 20, 1990. They purchased a twelve-pack of beer and at about 9 to 9:30 p.m. drove to "The Blitz," a dance club in Pipestone, Minnesota. While at The Blitz, Padovani, Crafton, and Fields continued drinking. They left The Blitz and drove to the Pomp Room between 10 and 11 p.m. The group continued drinking at the Pomp Room. Fodness arrived for work at the Pomp Room between 11 and 12 p.m. The trouble began at approximately 1 a.m. Padovani was speaking with a woman when Mike McKee, another co-worker of Fields, either slapped or punched Padovani on the head. A scuffle between Padovani and McKee ensued. One of the bouncers then informed Padovani that he had to leave and proceeded to push Padovani out the door. Jon Ertz, the manager of the bar, followed Padovani out the door. Outside the bar, a fight between Padovani and Ertz ensued. Fields followed Padovani out the door and became involved in the fight as either a peacekeeper or an active participant. At this point, the respective stories diverge.

Fields testified that Ertz punched him in the jaw and that Fodness then grabbed him and began punching him. Fields testified that Fodness walked him backwards across the street and over the sidewalk, and threw him into the bushes by the sidewalk. Further, Fields testified that Fodness continued to inflict bodily harm and would not let Fields go. Fields testified that he feared

Fodness and was able to describe the beating that Fodness had inflicted on him, but he could not remember pulling his knife or stabbing Fodness. Fields also testified that the alcohol that he had that night did not impair his memory of the events.

Jeff Sutter testified on behalf of Fields regarding a prior altercation Sutter had had with Fodness. Sutter testified that in August 1990 Fodness had grabbed him by the neck, carried him from outside the Pomp Room to the bushes across the street, put a knee in Sutter's chest, and threatened to break every bone in Sutter's body.

The testimonies of the government's witnesses differed from that of Fields. Bruce Friesth, a bouncer and bartender at the Pomp Room, testified that Fodness did not strike Fields. Rather, Fodness held Fields by the shoulders and "walked" him backwards across the street; Fodness or Fields stumbled on the curb opposite the Pomp Room; they quickly regained their balances; and Fodness deposited Fields in the bushes. Friesth saw Fields punching Fodness on the inside part of Fodness's body. Russell Doty, another bouncer at the Pomp Room, testified that Fodness had not hit Fields, but merely carried him across the street and deposited him in the bushes. Steve Bruns, a bartender at the Pomp Room, testified that Fodness walked Fields across the street and was straddling him when he was stabbed. Ricky Johnson, a customer at the Pomp Room, testified that Fodness and Fields were rolling around in the middle of the street before Fodness carried Fields into the bushes. Steve Wallin testified that Fodness and Fields exchanged blows while they wrestled on the ground in the middle of the street outside the Pomp Room, and that they both swung their fists at one another while they were in the bushes. No witness testified as to seeing the actual stabbing, but some saw Fodness fall onto Fields.

The government played to the jury, without objection, audiotapes of the two interviews of Fields which were conducted the night of the stabbing. On those tapes, Fields

---

1. "Homicide is justifiable when committed by any person in lawful defense of such person ... when there is reasonable ground to apprehend a design to ... do some great bodily injury, and imminent danger of such design being accomplished." S.D.Codified Laws § 22–16–35 (1988).

stated that he acted in self-defense. The government also introduced evidence that Fodness had been stabbed three or four times. Two of the wounds were fatal: one to the heart, and another to his liver. Fodness also had a defensive wound on the inside webbing of his hand. Fodness's wounds, however, arguably were consistent with Fields' claim of self-defense.

The major disputed issue concerned whether Fields acted in self-defense. Some of the government's witnesses testified that Fodness did not hit Fields and merely held Fields by the shoulders and "walked" him backwards across the street away from the entrance to the bar. Other government witnesses stated that Fields and Fodness were rolling around and wrestling in the middle of the street. One witness stated that both Fields and Fodness "exchanged blows" in the middle of the street. Most of the witnesses acknowledged that they had been watching the altercation between Ertz and Padovani and had not focused on the interactions between Fodness and Fields.

During closing argument, the prosecutor argued that Fields' testimony was not credi-ble, in part, because he testified that he did not remember stabbing Fodness. The prosecutor contrasted that testimony with Fields' statements to Officer Mattson and Detective Norlin that Fields did not want to talk about the stabbing.[2]

The jury deliberated and convicted Fields of first-degree manslaughter, and the trial court sentenced Fields to a prison term of sixty-five years. Fields appealed the jury verdict to the South Dakota Supreme Court claiming, among other arguments not relevant here, that the trial court committed plain error in allowing admission of evidence and committed error in allowing the prosecutor to comment, over Fields' timely objection, on Fields' post-arrest, post-*Miranda* warnings silence. The South Dakota Supreme Court affirmed Fields' conviction because it concluded that the prosecutor's statements did not violate *Doyle*.

Fields then sought habeas corpus relief in the United States District Court for the District of South Dakota. Fields' sole argument in district court was that remarks in the prosecutor's closing argument constituted improper references to Fields' invocation of

---

**2.** During closing argument, the prosecutor stated the following:

Specifically about the specific stabbing incident, where there is a slash and stabs and the defensive wound and so on, he told you folks—he said—he said, I was dazed, were his words. And I was shocked. And that's why I don't recall. That's what he said to you folks. What he said to Officer Mattson was different. What he said to Officer Mattson was he explained everything that occurred—and you may recall the last question that Officer Mattson asked the Defendant. He said, did you stab him, Ken? And do you recall the Defendant's answering, *I ain't saying nothing*. He didn't say that he was dazed. He didn't say, I'm in shock. He told him all about the self-defense but when it came to did you stab him, I ain't saying nothing. You decide whether that's consistent with the testimony that he gave you folks at trial. He was being interviewed by Detective Norlin. At the very beginning of the interview with Detective Norlin he says, are you willing to talk to me about this case. Do you recall his answer? He says, yeah, I'll talk to you to a certain extent. He gave an interview to Detective Norlin and explained to him all the facts and the circumstances leading up to this and then when it came down to the stabbing, when it came down to the stabbing he says, *I won't talk*

to you about that without an attorney. And he's entitled to that. That's a very precious rule of law that we all enjoy. He's entitled to that, but I bring that to you because he did not say to Detective Norlin that he was dazed. I was shocked. I don't recall. That's what he said to you folks. He did not say that to Detective Norlin. He says, I'll talk to you to a certain extent and then when the issue of the stabbing came up he refused. Instead, knowing that he was under arrest and knowing that the interview was being taped—because the tape recorder was laying right in front of him—instead what he said to Detective Norlin was dude was trying to do me bodily harm. Bodily harm. Dude was off the bar premises. Dude was off the bar. Bodily harm. Self-defense. That's not what he told you folks about the stabbing. Not, I'm dazed and I'm in shock. And that's why I don't remember what happened. Because he did and he does. The best thing that can be said about this Defendant's memory is that it is convenient. The best thing that can be said about his memory is that it is self-serving. You decide if this Defendant is trying to say the most correct thing at the most appropriate time. He was trying to say the most appropriate thing to law enforcement. The most appropriate thing to the Members of the Jury when he's here on trial. Trial Tr. at 485–87 (emphases added).

his right to silence under *Doyle*. The district court dismissed Fields' petition because, assuming that the prosecutor's remarks violated *Doyle*, those violations were harmless under the standard set out in *Brecht v. Abrahamson*, ––– U.S. –––, –––, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Fields appeals from that decision. ,

## II. DISCUSSION

Fields argues that the prosecutor violated his Fourteenth Amendment rights in violation of *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245, and that the violations were not harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Specifically, Fields argues that the district court erred when it applied the *Brecht v. Abrahamson* standard to evaluate the effect of the prosecutor's *Doyle* violations. The government argues that (1) the prosecutor committed no error because the prosecutor merely commented on earlier inconsistent statements by Fields, and (2) assuming that the prosecutor violated *Doyle*, the error does not warrant reversal. We conclude that the prosecutor's closing argument violated Fields' Fourteenth Amendment due process rights, and that violation was not harmless beyond a reasonable doubt.

### A. *Doyle* Violations

In *Doyle*, the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. at 2245. This rule rests on " 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.' " *Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634, 638, 88 L.Ed.2d 623 (1986) (quoting *South Dakota v. Neville*, 459 U.S. 553, 565, 103 S.Ct. 916, 923, 74 L.Ed.2d 748 (1983)). However,

> *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no

unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980) (per curiam). Nevertheless, "[w]ith respect to post-*Miranda* warnings 'silence,' ... silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Greenfield*, 474 U.S. at 295 n. 13, 106 S.Ct. at 640 n. 13. Thus, for purposes of analyzing a *Doyle* violation claim, we must treat a defendant's invocation of his *Miranda* rights not as a statement, but as post-*Miranda* warnings silence. *See id.* We apply these principles to the prosecutor's statements.

The prosecutor twice violated *Doyle* in his closing argument. First, he impeached Fields' trial testimony that he did not remember the stabbing by calling attention to his response, "I ain't saying nothing," to the question of whether he had stabbed Fodness raised by Officer Mattson during his first post-*Miranda* warnings interview. *See supra* note 2. Second, the prosecutor also referenced Fields' response, "I won't talk to you about that without an attorney," to questions by Detective Norlin regarding what happened when Fodness and Fields were in the bushes across the street from the Pomp Room. *See supra* note 2. Under *Greenfield*, both of the statements that the prosecutor used to impeach Fields' trial testimony were invocations of Fields' *Miranda* rights. *Cf. Greenfield*, 474 U.S. at 295, 106 S.Ct. at 640 (holding that defendant's invocation of *Miranda* rights is inadmissible to prove defendant's sanity). Further, *Anderson v. Charles*, 447 U.S. at 408, 100 S.Ct. at 2182, does not apply because Fields' invocation of his *Miranda* rights, i.e., the "statements" quoted by the prosecutor, are treated not as statements, but as "silence" for purposes of *Doyle*. *See Greenfield*, 474 U.S. at 295 n. 13, 106 S.Ct. at 640 n. 13 ("[W]e point out that silence ... includes the statement of a desire to remain silent, as well as of a desire to

remain silent until an attorney has been consulted."). *But see id.* at 300, 106 S.Ct. at 643 (stating that invocation of *Miranda* rights is not silence) (Rehnquist, J., concurring in result). We conclude that the prosecutor twice violated *Doyle* by impeaching Fields' trial testimony with his prior invocation of his *Miranda* rights.[3]

### B. Harmless Error Analysis

■ Both parties agree that this court must apply the *Chapman v. California*, 386 U.S. at 24, 87 S.Ct. at 828, "harmless beyond a reasonable doubt" standard because the South Dakota Supreme Court did not conduct a *Chapman* harmless error analysis on direct appeal. *See Orndorff v. Lockhart*, 998 F.2d 1426, 1430 (8th Cir.1993) (distinguishing *Brecht* and applying *Chapman* standard to determine whether error is harmless when federal court is the first court to review the effect of the constitutional error), *cert. denied*, — U.S. —, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994); *accord Starr v. Lockhart*, 23 F.3d 1280, 1291–92 (8th Cir.1994). When analyzing whether *Doyle* violations are harmless beyond a reasonable doubt, this court examines "[1] whether the government made repeated *Doyle* violations, [2] whether any curative effort was made by the trial court, [3] whether the defendant's exculpatory evidence is 'transparently frivolous,' and [4] whether the other evidence of the defendant's guilt is 'otherwise overwhelming.' " *Bass v. Nix*, 909 F.2d 297, 305 (8th Cir.1990). Applying this standard, we conclude that the prosecutor's *Doyle* violations were not harmless beyond a reasonable doubt.

First, as discussed above, the prosecutor committed two *Doyle* violations during his closing argument. The prosecutor referenced Fields' silence to impeach Fields' credibility. Fields' credibility was vital to his self-defense claim. Second, because the court overruled Fields' objection to the prosecutor's closing argument, the court made no curative effort to blunt the prejudice of the prosecutor's statements. The final two factors warrant a more extended discussion.

■ Fields' defense was not patently frivolous. Fields admitted that he had stabbed and killed Fodness but claimed that he did so in self-defense. Under South Dakota law, the government had the burden of disproving Fields' self-defense claim beyond a reasonable doubt. *State v. Reddington*, 80 S.D. 390, 125 N.W.2d 58, 61 (1963). Credible evidence supported Fields' defense. First, although Fodness was unarmed, he weighed about one hundred pounds more than Fields. Second, at least two witnesses testified that Fodness and Fields were wrestling in the middle of the street and may have been exchanging blows. Third, Fields testified that Fodness hit him repeatedly and that he was dazed and shocked by the beating. Finally, Sutter testified that in August 1990 Fodness had carried Sutter by the throat from the Pomp Room, across the street, deposited him in the bushes, and threatened to break every bone in Sutter's body. We cannot say that Fields' self-defense claim was "patently frivolous." *See Bass*, 909 F.2d at 305.

Finally, although the government's evidence was sufficient to support the jury's verdict, we cannot say that it was overwhelming on the only disputed issue: whether Fields acted in self-defense. Many of the government's witnesses acknowledged that they had focused on the altercation between Ertz and Padovani. No witness saw Fields stab Fodness; and there was conflicting testimony on whether or how many times Fodness struck Fields. In short, we cannot say that the government's evidence was overwhelming. *Cf. United States v. Turner*, 966 F.2d 440, 442–43 (8th Cir.1992) (holding *Doyle* violations harmless where evidence of guilt overwhelming).

Thus, all four *Bass* factors support the conclusion that the prosecutor's *Doyle* violations during closing argument were not harmless beyond a reasonable doubt. *See*

---

**3.** As was the case in *Greenfield*, the prosecutor could have referenced other statements made by Fields during his two post-arrest, post-*Miranda* warnings interviews to impeach his trial testimony that he did remember stabbing Fodness. *See*

*Greenfield*, 474 U.S. at 295, 106 S.Ct. at 640. For example, during his first interview, Fields stated that in response to Fodness' alleged beating, Fields "pulled defense," Trial Ex. 33, at 1 (transcript of first interview).

*Bass,* 909 F.2d at 305. The prosecutor made multiple references to Fields' silence to impeach his trial testimony; the district court offered no curative instruction; Fields' claim on the only contested issue was not patently frivolous; and the government's evidence, although sufficient to support the jury verdict, was not overwhelming on the issue of self-defense.

We conclude that the prosecutor's *Doyle* violations were not harmless beyond a reasonable doubt. *See Bass,* 909 F.2d at 305.

### III. CONCLUSION

For these reasons, we reverse the judgment of the district court and remand with instructions for the district court to conditionally grant the writ of habeas corpus, subject to the right of the State of South Dakota to retry Fields within a reasonable time.