# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1028

_____

United States of America,

          Appellee,

v.

Rodricho Martin,

          Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
Eastern District of Arkansas

_____

Submitted:  September 14, 2004
Filed:  December 14, 2004 (Corrected: 1/4/05)

_____

Before LOKEN, Chief Judge, BEAM, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Rodricho Martin appeals his convictions for interference with interstate commerce by threats or violence, in violation of 18 U.S.C. § 1951, and for use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). Martin argues that the district court[1] erred in (1) admitting unreliable eyewitness identifications, (2) excluding the testimony of his expert on eyewitness identifications, (3) failing to

_____

[1]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

declare a mistrial because of two alleged violations of *Doyle v. Ohio*, 426 U.S. 610 (1976), and (4) prohibiting his attorney from arguing that a witness avoided a mandatory life sentence by testifying. We affirm.

## I. BACKGROUND

On March 29, 2002, David Michael, the proprietor, and Gene Clay, an employee, were working at Michael Motor Company, a used car dealership in Pine Bluff, Arkansas. Around 10:00 or 10:30 a.m., three men entered the dealership and asked Michael about purchasing and financing a car. The three men then left.

Later that day, they returned. Larry Taggart and a man later identified as Rodricho Martin accompanied Michael into the business office to complete credit documents while the third man, Jason Taggart, remained in the car lot. Once inside, Larry Taggart first discussed his creditworthiness with Michael and then excused himself to use the restroom. Upon his return, Taggart hit Michael on the head with a handgun and knocked him from his chair. The other inside assailant, Martin, began fighting with Michael. The assailants struggled with Michael over a cash box and telephone. At that point, Martin told Taggart to shoot Michael. Michael grabbed at the gun in Taggart's hands. The gun discharged into the ceiling, and Martin and Taggart ran from the office. Michael was not shot, but he suffered hearing loss from the gun discharge.

The Pine Bluff Police Department's investigation led to Jason and Larry Taggart. Both Michael and Clay identified Jason Taggart in a photographic spread on April 1, 2002. Michael also identified Larry Taggart, but Clay did not. The next day, police arrested both Taggarts, who confessed to their involvement in the robbery and implicated Martin as the third suspect.

Based on the Taggarts' statements, Detective Henry Hudspeth and other police officers went to Martin's home and left a business card with a note asking him to come to the police station. Martin appeared at the Pine Bluff Police Department on April 2, 2002. An officer took a Polaroid photograph of Martin to be used in a photographic spread shown to Michael and Clay. However, Martin refused to exhibit a straight face for the camera and kept "bugging his eyes, making funny or strange faces with his mouth and all." Later that day, police showed the resulting photograph to Michael and Clay in a six-picture photographic spread. Both Michael and Clay stated that the picture of Martin resembled the third suspect, but neither were sure because Martin's facial contortions distorted his appearance.

In August 2002, four months after the crime, police obtained a normal picture of Martin from an Arkansas State Police database. Using the undistorted photograph of Martin, they showed Michael and Clay another six-picture photographic spread. Both Michael and Clay identified Martin without hesitation in this spread. Martin's photograph was the only one to occur in both of the photographic spreads shown to Michael and Clay.

A grand jury indicted Martin for one count of interference with interstate commerce by threats or violence, in violation of 18 U.S.C. § 1951, and one count of using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). A jury convicted Martin of both counts. The district court sentenced Martin to consecutive prison terms of 63 months on Count 1 and 120 months on Count 2, followed by three years of supervised release.

## II. DISCUSSION

### A. Eyewitness Identifications[2]

Martin argues that the pretrial photographic spreads from which Michael and Clay identified him as the third robber were irreparably unreliable, rendering the resulting eyewitness identifications inadmissible violations of due process. He contends that presenting two spreads that shared only his picture was impermissibly suggestive and that neither Michael nor Clay should have been allowed to identify him as the third suspect. We disagree.

This court reviews determinations of admissibility of evidence for abuse of discretion. *United States v. Kehoe*, 310 F.3d 579, 590 (8th Cir. 2002). To determine whether the identifications by Michael and Clay were unreliable, this court employs the two-step analysis of *Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir. 1984). Martin must first establish that the photographic spreads shown to Michael and Clay were "impermissibly suggestive." *Id.* (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). If the spreads were impermissibly suggestive, "the second inquiry is whether, under the totality of the circumstances of the case, the suggestive confrontation created 'a very substantial likelihood of irreparable misidentification.'" *Graham*, 728 F.2d at 1541 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)).

The photographic spreads used to identify Martin were not impermissibly suggestive. In *Armstrong v. Gammon*, 195 F.3d 441 (8th Cir. 1999), this court held that an out-of-court identification based on two six-person photographic spreads sharing only a picture of the defendant was not impermissibly suggestive and that the

---

[2]In this case, our analysis applies equally to the in-court identifications and out-of-court photographic spread identifications of Martin by Michael and Clay. For this reason, we use the terms "eyewitness identification" or "identification" to refer to both in-court and out-of-court identifications.

corresponding in-court identification was not unreliable. *Id.* at 445 (citing *United States v. Johnson*, 56 F.3d 947, 954 (8th Cir. 1995)). The first photographic spread in *Armstrong* contained a three-year-old picture of the defendant that the victim tentatively identified as her attacker. The second photographic spread, presented three days later, contained a photograph of the attacker taken after his arrest, and the victim identified the defendant without hesitation. As in *Armstrong*, the witnesses in this case thought a picture in the first spread resembled the suspect but could not make a positive identification because of some distortion. When an undistorted picture was presented later, both witnesses confidently identified the suspect.

The spreads in this case are less suggestive than those in *Armstrong*. First, in *Armstrong*, only three days separated the display of the two spreads to the witness. In this case, a full four months passed between the review of the two spreads, lessening any suggestive tendency. Second, Martin's intentional facial contortions likely created more distortion than the three years of aging between the photographs in the *Armstrong* spreads. Following *Armstrong*, we conclude that the photographic spreads in this case were not impermissibly suggestive.

Even if the spreads were impermissibly suggestive, they would not have created a substantial likelihood of irreparable misidentification. To determine whether an identification procedure would create a substantial likelihood of irreparable misidentification, we consider factors such as "the opportunity of the witness to view the suspect during the commission of the crime; the witness's degree of attention; the accuracy of the witness's prior description of the suspect; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation." *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996) (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Applying these factors to this case, we conclude that the two photographic spreads with Martin's picture did not create a substantial likelihood of irreparable

misidentification. Michael and Clay each had a significant opportunity to view Martin both during his first visit to the car lot as a potential customer and later during his participation in the crime. Indeed, Michael struggled with Martin in close proximity and with good reason for heightened attention. Although both Michael and Clay were hesitant to identify Martin as the third robber because of his contorted face in the first spread, both were certain of their identifications in the second spread. There is no reason to believe that the four months between the robbery and their viewing of the second spread would diminish their ability to identify a man who had violently attempted to rob them.

For these reasons, we hold that the photographic spreads shown to Michael and Clay were not impermissibly suggestive and did not create a substantial likelihood of irreparable misidentification. The trial court committed no error in allowing Michael and Clay to identify Martin as the third suspect.

### B. Expert Testimony

Prior to trial, the district court held a hearing to determine whether Martin could present to the jury expert testimony on eyewitness identification from Edward Geiselman, Ph.D. Dr. Geiselman testified about his qualifications, the scientific validity of his field, and the assistance his testimony might provide to jurors in evaluating the accuracy of eyewitness identifications. Martin contends that the district court erred in not allowing Dr. Geiselman to testify at trial as an expert on eyewitness identification. We disagree.

This court reviews the exclusion of expert testimony for abuse of discretion. *United States v. Rose*, 731 F.2d 1337, 1345 (8th Cir. 1984). Expert testimony is admissible only if the expert "is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 (1993); Fed. R. Evid. 702. We need not

consider whether Dr. Geiselman proffered scientific knowledge, as we hold that the district court did not abuse its discretion because his testimony would not have substantially aided the jury in understanding or determining a fact in issue. *See Daubert*, 509 U.S. at 591.

Dr. Geiselman's proffered testimony related only to the general reliability of eyewitness identifications. He would not have offered an opinion as to the reliability of either Michael's or Clay's identifications of Martin. The general reliability of eyewitness identification is a matter of common understanding. In fact, the district court specifically instructed the jury to weigh the strength of Michael's and Clay's eyewitness identifications by considering various reliability-related factors, including the length of time the witness observed the person, the prevailing conditions such as distance and visibility, and the strength of later identifications. *See United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996) ("The advisory committee's notes [to Fed. R. Evid. 702] make it clear that when the layman juror would be able to make a common sense determination of the issue without the technical aid of such an expert, the expert testimony should be excluded as superfluous."); *United States v. Harris*, 995 F.2d 532, 535 (4th Cir. 1993) (affirming the exclusion of proffered eyewitness identification expert testimony because "jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination").

In addition, the eyewitness identifications of Martin by Michael and Clay were fully corroborated by the Taggarts' testimony against Martin. This corroborating evidence provided by Martin's co-conspirators further supports the district court's decision to exclude Dr. Geiselman's testimony. *See United States v. Davis*, 260 F.3d 965, 970 (8th Cir. 2001) (holding that the district court did not err by excluding an eyewitness identification expert because "we are 'especially hesitant to find an abuse of discretion unless the government's case against the defendant rested exclusively

7

on uncorroborated eyewitness testimony'") (quoting *United States v. Blade*, 811 F.2d 461, 465 (8th Cir. 1987)).

Thus, the district court did not err in excluding Dr. Geiselman's testimony.

**C. Alleged *Doyle* Violations**

During direct examination of Detective Hudspeth, the prosecution asked him when he first became aware that the Polaroid of Martin was shown in a photographic spread to Michael and Clay. Detective Hudspeth responded, "After I read Rodricho Martin his rights and he wanted a lawyer." Martin's attorney objected and moved for a mistrial on the ground that the statement was an improper reference to Martin's invocation of his right to counsel. The district court refused to grant a mistrial but offered to give a curative instruction, which Martin's attorney refused. Later during direct examination, Detective Hudspeth again mentioned that Martin asked for a lawyer. Martin's attorney again moved for a mistrial, which the district court denied.

Martin argues that Detective Hudspeth's references to his invocation of his right to counsel after a *Miranda* warning constituted reversible error under *Doyle v. Ohio*, 426 U.S. 610 (1976). We disagree.

To determine whether a putative *Doyle* violation constitutes reversible error, we first ask whether a *Doyle* violation occurred, and, second, whether that violation was harmless beyond a reasonable doubt. *United States v. Burns*, 276 F.3d 439, 441-42 (8th Cir. 2002). We need not address the first part of this analysis, because even if we assume that Detective Hudspeth's statements violated Martin's rights under *Doyle*, we hold that those alleged violations would have been harmless beyond a reasonable doubt.

We use the following factors to determine whether a *Doyle* violation was harmless beyond a reasonable doubt: "whether the government made repeated *Doyle* violations, whether any curative effort was made by the trial court, whether the defendant's exculpatory evidence is 'transparently frivolous,' and whether the other evidence of the defendant's guilt is 'otherwise overwhelming.'" *Bass v. Nix*, 909 F.2d 297, 305 (8th Cir. 1990); *see also Vick v. Lockhart*, 952 F.2d 999, 1002 (8th Cir. 1991).

This case is similar to *United States v. Wiley*, 29 F.3d 345, 349-50 (8th Cir. 1994). In *Wiley*, the defendant testified that he was in the "wrong place at the wrong time," and gave an explanation of the events surrounding his arrest for cocaine possession that this court considered "fraught with incredible elements." *Id*. at 350. This court held that, despite three conceded *Doyle* violations for which no curative actions were taken, the evidence was so overwhelming and the defense so frivolous that the errors were harmless.

Comparing the application of the *Bass* factors in the instant case to their application in *Wiley*, we conclude that the alleged *Doyle* violations here are harmless beyond a reasonable doubt. With respect to the first two *Bass* factors, in *Wiley* the prosecution conceded three *Doyle* violations; in the instant case, there are two alleged violations. In this case, the court offered to give a curative instruction; in *Wiley*, no curative instruction was offered.

With respect to the third *Bass* factor, in *Wiley* the defendant at least offered an alternative explanation of the relevant events. Martin offered no alibi and no rebuttal of the prosecution's evidence of his participation in the robbery. The only exculpatory evidence presented by Martin was his father's testimony concerning the "bad blood" between the Taggarts and Martin. We find that this defense is "transparently frivolous" for purposes of the *Bass* harmless-error analysis. *See*, *e.g.*, *United States v. Grant*, 17 F.3d 935, 944 (7th Cir. 1994) ("[T]he less believable the

defense, . . . the more likely the conclusion that the constitutional error did not contribute to the conviction.") (quotation omitted).

The final *Bass* factor is whether the evidence of guilt was otherwise overwhelming. Two eyewitnesses and both co-conspirators identified Martin as the third robber. In his brief, even Martin admits that "[i]f the testimony of both co-defendants [is] taken as truth and the identifications of Michael and Clay are received as undeniable, then the evidence against the defendant was overwhelming." The testimony of two co-conspirators along with two eyewitness identifications constitutes overwhelming evidence of Martin's guilt. *See United States v. Turner*, 966 F.2d 440, 442-43 (8th Cir. 1992) (holding repeated *Doyle* violations harmless in light of overwhelming evidence of guilt).

Based on our application of the *Bass* factors, we hold that, assuming without deciding that Detective Hudspeth's statements violated *Doyle*, these errors would be harmless beyond a reasonable doubt.

**D. Limitation on Closing Argument**

Martin argues that the district court committed reversible error by prohibiting counsel from arguing during closing that Larry Taggart avoided a mandatory life sentence by testifying against him. We disagree.

This court reviews rulings on the conduct of closing arguments for abuse of discretion. *United States v. Flynn*, 196 F.3d 927, 930 (8th Cir. 1999). We afford district courts "broad discretion in controlling closing arguments and will not reverse a conviction absent a showing of abuse of discretion." *United States v. McGuire*, 45 F.3d 1177, 1189 (8th Cir. 1995). Even if the district court erred in refusing to allow Martin's attorney to argue certain inferences during his closing argument, this court will not reverse if the error was harmless. Fed. R. Crim. P. 52(a); *see also Cochenour*

*v. Cameron Savings and Loan, F.A.*, 160 F.3d 1187, 1190-91 (8th Cir. 1998) (holding that the district court's refusal to allow plaintiff's attorney to address a particular issue in his closing argument was harmless error); *United States v. Daniele*, 886 F.2d 1046, 1052-53 (8th Cir. 1989) (holding that the district court erred in excluding testimony offered to impeach a Government witness, but that error was harmless because the defendant was able to thoroughly cross-examine the witness on the same subject).

Larry Taggart admitted on cross-examination that he initially told police that Martin held the gun during the robbery attempt but changed his story after accepting a plea bargain and agreeing to testify. He also admitted that he had two prior convictions for residential burglary which he believed to be crimes of violence. Martin's attorney sought to establish that Taggart changed his story to conform to Michael's account of the robbery in order to avoid a life sentence under the so-called "three strikes" law. Martin's attorney asked Taggart, "They told you that you were an armed career criminal and subject to three strikes if you didn't cut a deal, didn't they?" Taggart answered, "No, sir." In further cross-examination, Taggart then admitted that the prosecution agreed to dismiss a firearm charge carrying a ten-year mandatory minimum sentence under 18 U.S.C. § 924(c) as part of its plea agreement with him.

During an in-chambers conference prior to closing arguments, the prosecution objected to Martin's attorney's plan to argue that Taggart changed his story to avoid a life sentence. The parties discussed whether Taggart was eligible for sentencing as an "armed career criminal" or subject to a life sentence based on the "three strikes" provision.[3] The prosecution argued that Taggart could not have been charged as an

---

[3]The armed career criminal statute, 18 U.S.C. § 924(e), provides for a mandatory minimum sentence of 15 years' imprisonment for anyone convicted under 18 U.S.C. § 922(g) who has three previous violent felony or serious drug convictions. *See, e.g.*, *United States v. Menteer*, 350 F.3d 767, 768 (8th Cir. 2003) (holding that

armed career criminal.[4]  Martin's attorney responded that Taggart "had two strikes against him, this is a third strike," but the district court sustained the prosecution's objection.

Before addressing the merits of Martin's claim, we disagree with the prosecution's claim that the "three strikes" issue was not preserved for appeal. Although Martin's attorney confused the basis for his argument with repeated references to the armed career criminal statute, his references to the three strikes provision were sufficient to preserve his objection.

The district court sustained the prosecution's objection because it would not permit the jury to "deliberate on conjecture and speculation."  It is unclear from the record whether the cited speculation concerned Taggart's eligibility for a life sentence or Taggart's knowledge of his eligibility for a life sentence.  If the speculation concerned Taggart's knowledge, then we cannot say that it was an abuse of discretion to exclude an argument that Taggart was induced to change his story to avoid a life sentence.  Taggart testified that he was not told that he was subject to the three strikes provision if he did not accept the plea agreement, and nothing else in the record indicates that the parties contemplated the possibility that the agreement avoided a life sentence for Taggart. *See United States v. Warfield*, 97 F.3d 1014, 1021 (8th Cir.

_____

the defendant was properly sentenced as an "armed career criminal" under § 924(e)).

The three-strikes sentencing enhancement of 18 U.S.C. § 3559(c) provides for a life sentence upon a third conviction for certain serious violent crimes. *See*, *e.g.*, *United States v. Williams,* 308 F.3d 833, 835 (8th Cir. 2002) (referring to the "three-strikes enhancement" under 18 U.S.C. § 3559).

[4]The prosecution argued that it could not charge Taggart as an armed career criminal because the gun had not been recovered.  Without the gun, the prosecution argued that it could not prove that the gun had been shipped or transported in interstate commerce, as required by 18 U.S.C. § 922(g).

1996) (holding that the district court did not abuse its discretion by prohibiting defense counsel from arguing claims that were not supported by the record).

Even if we were to find error in excluding this argument, we would hold that any error was harmless. The evidence of Martin's guilt was overwhelming, and Martin's attorney fully explored a significant inducement for Taggart's testimony by establishing that the prosecution had agreed to dismiss a firearms charge with a mandatory minimum ten-year sentence in return for Taggart's cooperation. *Cf. United States v. Beckman*, 222 F.3d 512, 524 (8th Cir. 2000) (holding that the critical factors in determining whether a limitation of cross-examination violated the Confrontation Clause are "whether defendant had other means available to obtain the same effect as the excluded inquiry," and whether a reasonable jury would have "received a significantly different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination").

## III. CONCLUSION

For these reasons, we affirm Martin's convictions.