Mark A. KIBBE, Petitioner,

v.

Larry E. DUBOIS and Scott Harshbarger, Respondents.

No. Civ.A. 97–10010–NG.

United States District Court,
D. Massachusetts.

Sept. 26, 2000.

Brownlow M. Speer, Committee For Public Counsel Services, Boston, MA, for Mark A. Kibbe, petitioner.

Pamela L. Hunt, Attorney General's Office, Criminal Bureau, Boston, MA, Annette C. Benedetto, Assistant Attorney General, Criminal Bureau, Boston, MA, for Larry E. DuBois, Respondent, as he is Commissioner of Correction of the Commonwealth of Massachusetts, Scott Harshbarger, Respondent, as he is Attorney General of the Commonwealth of Massachusetts.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

Petitioner Mark A. Kibbe ("Kibbe") comes before this Court in an action for the writ of habeas corpus. Kibbe was convicted of arson by a Massachusetts Su-

perior Court jury on June 10, 1992. The state court sentenced him to a prison term of five to ten years to begin after Kibbe completes a twenty-year sentence which he is currently serving on unrelated charges.

The Appeals Court of Massachusetts summarily affirmed Kibbe's conviction in March 1995. *Commonwealth v. Kibbe,* 38 Mass.App.Ct. 1111, 646 N.E.2d 1097 (Mass.App.Ct.1995) (mem.). On April 25, 1995, the Supreme Judicial Court of Massachusetts denied Kibbe's request for further review.[1] *Commonwealth v. Kibbe,* 420 Mass. 1102, 648 N.E.2d 1286 (Mass. 1995). Petitioner's state court remedies have been exhausted as required by 28 U.S.C. § 2254(b).

Presently, Kibbe asserts that his constitutional right to due process was violated as a result of several errors made by the prosecutor during the trial of his case. The prosecutor, Kibbe claims, erred when he referred to Kibbe's post-*Miranda* silence during cross-examination and closing arguments in violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Kibbe also claims the prosecutor erred by shifting the burden of proof during closing argument. I agree that the prosecutor erred, and that these errors rise to the level of constitutional violation. Furthermore, I agree that the *Doyle* errors are not harmless within the meaning of the relevant case law. I therefore **GRANT** the writ of habeas corpus.

## I. *FACTS*

A fire broke out in an abandoned house at 171 Almira Road in Springfield, Massachusetts, shortly after 11:00 p.m. on November 19, 1991. A neighbor reported the fire and waited outside his home for the fire trucks to arrive. From that vantage

1. The Supreme Judicial Court's summary affirmance (without discussion) is presumed to rest on the same ground as the Appeals Court decision. *See Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("If an earlier opinion 'fairly appear[s] to rest primarily upon federal law,' we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place.") (citations omitted). This Court must look to the reasoned opinion of the Appeals Court for an explanation of the Supreme Judicial Court's decision. Thus, the Court will refer to the Appeals Court's unpublished opinion as the "state-court decision" in this case.

point, the neighbor observed a person wearing a bright red or orange jacket walk from the back of the yard at 171 Almira Road, and down the driveway toward the edge of the road. This person stood for a moment, until the sirens became audible in the distance. The person then turned and walked back up the driveway toward the backyard of 171 Almira Road.

Within minutes a police cruiser, with Officers Witkowski and Rooke inside, arrived at the scene and spoke to the neighbor who had reported the fire. When Officer Witkowski entered the backyard of the burning house, he saw Kibbe in the rear corner of the yard wearing a red jacket. Officer Witkowski identified himself as a police officer and requested that Kibbe talk with him.[2] At that point, Kibbe ran.

Kibbe was apprehended in the woods, after he had stumbled and fell. The officers recovered a flashlight, gloves, and a small propane tank. (The propane tank had no evidentiary value. The officers later learned that the likely cause of the fire was an open flame, not an accelerant such as propane.) They observed soot on Kibbe's clothes and face, and noted he smelled of smoke, but not tobacco smoke. They gave him *Miranda* warnings and asked him to return to their cruiser at the scene of the fire. There, Kibbe was placed under arrest and subjected to a pat-down search. At the officers' direction, Kibbe removed matches, paper towels, a pipe, and pipe tobacco from his pockets.[3]

The officers asked Kibbe several questions concerning his reasons for being in the area of the abandoned house.[4] Officer Witkowski testified in relevant part:

[Counsel]      And at that point you had a conversation with [Kibbe]; is that correct?

[Witkowski]   A brief conversation.

[Counsel]      Regarding that incident? Regarding the incident; is that correct?

[Witkowski]   Regarding his reason for being in the area, yes.

[Counsel]      And he answered your questions?

[Witkowski]   Yes, sir.

[Counsel]      And he told you why he was in the area?

\* \* \*

[Witkowski]   Yes, sir.

Respondent's Supplemental Answer, Exhibit No. 5, at 20–21 [hereinafter "Trial Trans."].

Kibbe's response to Witkowski concerning why he was near the abandoned house was entirely consistent with the account he related at trial: He lived nearby and was walking around the neighborhood to smoke his pipe, since smoking in his home was not allowed. While walking in the nearby woods, he found shopping bags, a flashlight, and a propane cylinder tank. He put the latter two items into the shopping bag and took them with him. Kibbe maintained that he entered the backyard of the abandoned house to urinate when he noticed smoke coming from a window. Not knowing what to do, Kibbe walked up the driveway toward the street but then heard sirens and returned to the back yard.

Kibbe also testified as to why he had run from the police: an area about which

2. At trial, Kibbe testified that he ran before Officer Witkowski identified himself and asked to speak with Kibbe. Kibbe recalled only hearing Officer Rooke call for him to stop as Kibbe was running down the street.

3. In the early morning hours on the day following the fire, its cause was investigated by a Springfield Fire Department investigator. He found the fire's point of origin to be in the cellar, twenty to thirty feet inside the cellar door. A partition and some lumber had been burned there. Beside the pile of lumber that had been set on fire, the investigator found a book of burned matches, and some burnt pieces of paper. He was unable to determine whether the paper was paper towel or some other type of paper, such as newspaper. On the outside of the building, to the left of the cellar door, the fire inspector found a few rolled up paper towels. He concluded that the fire had been deliberately set by an open flame. He found no accelerant at work.

4. The other arresting officer, Eugene Rooke, did not testify that he had any conversation with Kibbe.

Witkowski had *not* questioned him. Kibbe testified that when the police arrived he became frightened and ran because he was on parole. When the police officers caught up with Kibbe and brought him back to their patrol car, Kibbe did not hesitate to answer the questions asked of him. All questions concerned why Kibbe had been in the area of the fire. On direct examination by defense counsel, Kibbe summarized the interrogation as follows:

| [Counsel] | And after he brought you back to the car what did you do? |
|---|---|
| [Kibbe] | They questioned me as to what I was doing. I answered them over and over again. |

\* \* \*

| [Counsel] | All right. When they were questioning you what did you tell them? |
|---|---|

\* \* \*

| [Kibbe] | I told them what had happened. |
|---|---|
| [Counsel] | All right. And did you do anything physically. |
| [Kibbe] | Not to my memory except to pull the stuff out of my pockets. |
| [Counsel] | Okay. So you explained to them what happened; is that correct? |
| [Kibbe] | Yes. |

Trial Trans. at 89–90.

On cross-examination, the state prosecutor inquired further:

| [Prosecutor] | You didn't tell the police you ran because you were on parole, right? |
|---|---|
| [Kibbe] | No, I did not. |
| [Prosecutor] | You never told them why you ran? |
| [Kibbe] | I don't believe I did. |

Trial Trans. at 98.

Defense counsel did not object to these questions.[5] These were the last questions Kibbe answered while on the witness stand.

In closing argument to the jury, the state prosecutor made the following remarks:

The fire is caught in its incipient stage, right at the beginning. And who is there right at the beginning? Mark Kibbe was, nobody else was in the area. And he tells you that he is there before the smoke is even seen. *And he runs. And he tells you he runs because he is on parole, but you know he didn't tell the police that, didn't offer that as an explanation for what he was doing.*

In a case where you're the finders of facts, you have to decide credibility ... You must decide whether you believe what Mark Kibbe said. Whether it had a ring of truth or whether it didn't. *If you don't believe what Mark Kibbe said, Mark Kibbe is guilty ...*

There's a reasonable inference ... of guilt of consciousness, guilt from his flight. The explanation that he offered to you is not worthy of believing. This is a fanciful explanation, not one that comports with your idea of common sense. I urge you to look closely at the dice. I urge you to decide credibility and having decided that, you'll know what the facts are and the facts are that Mark Kibbe is guilty of setting this fire ... The only doubts in this case are doubts that are whimsical and fanciful and speculation. They are not reasonable. It is not a reasonable story. It is

---

5. Despite defense counsel's failure to object to the pertinent portions of the prosecutor's cross-examination and closing argument, this procedural default does not prevent habeas review of Kibbe's federal claims. The Appeals Court of Massachusetts did not make any statement to the effect that its judgment rested on a state procedural bar. Instead, the Appeals Court discussed the merits of Kibbe's *Doyle* claim. The *Kibbe* decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and ... the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Coleman v. Thompson*, 501 U.S. 722, 734–35, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Since the state court did not rely on an independent and adequate state ground in rejecting any aspect of Kibbe's claim, this Court may address the petition. *Id.* at 735, 111 S.Ct. 2546; *Harris v. Reed*, 489 U.S. 255, 265–66, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989).

the one arrived at after the facts to mislead you ... Listen to the law from the judge and take the common sense that you have as everyday citizens, as jurors, and apply it to the facts and tell us where the truth lies.

Trial Trans. at 117–18 (emphasis added).

Defense counsel objected to the closing remarks, "If you don't believe what Mark Kibbe said, Mark Kibbe is guilty." Counsel did not ask for a curative instruction, nor did counsel specifically object to the remarks regarding Kibbe's post-arrest silence.

## II. CLAIM ONE—RIGHT TO REMAIN SILENT

Kibbe claims that the state prosecutor's cross-examination and closing argument violated his Fourteenth Amendment right to due process under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The prosecutor referred to Kibbe's failure to disclose to the police his reason for fleeing after Kibbe had received *Miranda* warnings. The Appeals Court of Massachusetts rejected the argument that a *Doyle* violation had occurred. Respondent's Supplemental Answer, Exhibit No. 3, at 2 (Memorandum and Order Under Rule 1:28) [hereinafter "Appeals Court Op."]. The Supreme Judicial Court of Massachusetts denied Kibbe's Application for Further Appellate Review without discussion. *Commonwealth v. Kibbe,* 420 Mass. 1102, 648 N.E.2d 1286 (Mass.1995).

I conclude that the decision of the Appeals Court in *Commonwealth v. Kibbe* erroneously and unreasonably found no *Doyle* violation. The *Kibbe* decision is both contrary to, and involves an unreasonable application of, clearly established federal law. Furthermore, after reviewing

the trial transcripts, I find that the errors were not harmless.

### A. Standard of Review

Kibbe's first claim must be reviewed pursuant to 28 U.S.C. § 2254(d) as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 [6] which states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The Supreme Court recently interpreted this provision in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). There, the Court gave independent meaning to the two distinct clauses of § 2254(d)(1)—the so-called "contrary to" clause and the "unreasonable application" clause.[7] *Williams,* 120 S.Ct. at 1519–23. The Court described the operation of the statute as follows:

Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the 'unreason-

---

**6.** Kibbe filed his petition in January 1997; his case is governed by the 1996 amendments to the habeas statute.

**7.** The Court read the section as authorizing habeas relief where the relevant state-court decision is "either (1) 'contrary to ... clearly

established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States.' " *Williams,* 120 S.Ct. at 1519.

able application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1523. In other words, the Court outlined two scenarios justifying a federal court's grant of habeas relief pursuant to the "contrary to" clause: (1) where a state-court decision applies the "wrong" rule; or (2) where the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different than that reached by the Court (implicitly applying the "wrong" rule). *Id.* at 1519–20. If the state court identifies the correct governing legal principle from the Supreme Court's decisions, however, the habeas court then proceeds to evaluate the claim under the unreasonable application clause (i.e., whether the state court reasonably applied that legal principle to the facts of the prisoner's case).[8] *Id.* at 1523. The two clauses are not mutually exclusive. A state-court decision may be both contrary to, and involve an unreasonable application of, Supreme Court law. *Id.* at 1515.

An unreasonable application of federal law is different from an incorrect or erroneous application of federal law. *See Williams,* 120 S.Ct. at 1522. It is necessary, but not sufficient, that the habeas court find the state-court decision to be erroneous or incorrect. The habeas court must also find that the application was unreasonable. *Id.* The Court, however, did not define "unreasonable application."[9]

Prior to the *Williams* decision, the First Circuit attempted to clarify the meaning of "unreasonable" in *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998). As did the Supreme Court later in *Williams,* the court explicitly rejected the subjective test used by other circuits "as too deferential because it focuses on the reasonableness of individual judges, more so than on the reasonableness of judicial decisions." *Id.* at 25 n. 7.[10] But it substituted another test, which has been criticized as being too deferential in its own right:

> We think it is pellucid, however, that the 'unreasonable application' clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result. Rather, for the writ to issue, the state court decision

---

8. The Fourth Circuit added a second category—"extension of legal principle" cases—where a federal court would be justified in granting habeas relief under the "unreasonable application" clause. *Williams,* 120 S.Ct. at 1521. That is, the Fourth Circuit asserted that a state-court decision involves an unreasonable application of the Supreme Court's precedent if the state court either (a) unreasonably extends a legal principle from the Court's precedent to a new context where it should not apply or (b) unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 1520. The Supreme Court, however, declined to resolve how such "extension of legal principle" cases should be treated under AEDPA. *Id.* at 1521. The Court noted that the Fourth Circuit's classification is problematic because it would be "difficult to identify separately those state-court decisions that involve an unreasonable application of a legal principle (or an unreasonable failure to apply a legal principle) to a new context." *Id.*

9. The Court states in relevant part: "The term 'unreasonable' is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Williams,* 120 S.Ct. at 1522.

10. In *Williams,* the Court noted that a federal habeas court making the "unreasonable application" inquiry should apply an objective, as opposed to subjective, standard. *Id.* at 120 S.Ct. at 1521–22. Thus, the Court rejected the Fourth Circuit's test which asked whether the state court applied federal law " 'in a manner that reasonable jurists would all agree is unreasonable.' " *Id.* at 1521. The "all reasonable jurists" standard misleads federal habeas courts by focusing their attention on a subjective inquiry—whether the state judge is a reasonable jurist—rather than an objective inquiry—whether the judicial decision is reasonable. *Id.* at 1522.

must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.

*O'Brien*, 145 F.3d at 25.

Both the Third and Eighth Circuits agreed that the "outside-the-universe-of-plausible-outcomes" test would "doubtless lead to the denial of virtually all petitions." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 889 (3rd Cir.1999) (en banc); *Long v. Humphrey*, 184 F.3d 758, 760 (8th Cir.1999) (finding the Third Circuit's position persuasive). The *O'Brien* "definition seemingly would exclude all but the most implausible of holdings" and require "an explicit finding that the state court decision—often, a decision of the state's highest court—was so far off the mark as to suggest judicial incompetence." *Matteo*, 171 F.3d at 889.

■ In *Williams*, the Supreme Court adopted the "objectively unreasonable" test, using language similar to that employed in the Third and Eighth Circuits.[11] *See Williams*, 120 S.Ct. at 1521–22. The Court, however, did not express a view as to the appropriateness of *O'Brien*'s "outside-the-universe-of-plausible-outcomes" test.[12] All that is clear is that the Court rejected the overly deferential "reasonable jurist" test while recognizing the legislative purpose of AEDPA—to increase the overall deference to state court judgments in federal habeas proceedings. *Williams*, 120 S.Ct. at 1509, 1521–22. The general approach, then, is this: It is not enough for a habeas court to find that the state court chose one of two equally plausible interpretations of federal law and that the habeas court would have chosen the other interpretation. Where a state court reaches a result that cannot be objectively justified in reference to the existing case law and the underlying evidentiary record, however, the state-court decision may be viewed as not only erroneous, but unreasonable as well.

**11.** The Ninth Circuit is the only federal circuit court that has characterized the *Williams* standard for reviewing the reasonableness of state-court decisions. *See Tran v.Lindsey*, 212 F.3d 1143, 1152–54 (9th Cir.2000). In *Tran*, the court held that a federal habeas court must find "plain error" occurred in order to find a state court decision objectively unreasonable. *Id.* at 1153–54. Explaining that view, the Ninth Circuit wrote:

[W]e hold that under AEDPA we must reverse a state court's decision as involving an 'unreasonable application' of clearly established federal law when our independent review of the legal question does not merely allow us ultimately to conclude that the petitioner has the better of two reasonable legal arguments, but rather leaves us with a 'firm conviction' that one answer, the one rejected by the [state] court, was correct and the other, the application of the federal law that the court adopted, was erroneous—in other words that clear error occurred.

*Id.* According to the Ninth Circuit, plain error analysis strikes the proper balance between deference to the state court and the necessary exercise of Article III powers in federal habeas cases.

To justify this characterization of the *Williams* standard, the Ninth Circuit noted that the Supreme Court employed the "objec-

tively unreasonable" language used in earlier decisions of the Third and Eighth Circuits. *See id.* at 1150–51 (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 889–90 (3d Cir.1999), and *Long v. Humphrey*, 184 F.3d 758, 760 (8th Cir.1999)). Those circuit decisions "espoused the more robust habeas review" of the three competing pre-*Williams* viewpoints. *See Tran*, 212 F.3d at 1151. Thus, the Ninth Circuit construed the "unreasonable application" clause with the Supreme Court's endorsement of the "more robust habeas view" in mind.

**12.** Whether or not the First Circuit's test is too deferential in light of *Williams* does not need to be resolved in this case. Following *O'Brien*'s directive to evaluate the state-court decision in the present case against existing precedent and the evidentiary record, the *Kibbe* decision is not a credible outcome for the reasons discussed in this opinion. *O'Brien*, 145 F.3d at 25. This Court does not share the Third Circuit's opinion that to grant habeas relief under the *O'Brien* standard is to "suggest judicial incompetence" on the part of the Massachusetts appellate courts. *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 889 (3rd Cir.1999).

■ Finally, *Williams* addressed the meaning of the phrase "clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* at 1523. The statutory language restricts the source of clearly established law to the Supreme Court's jurisprudence. That phrase refers only to "the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision."[13] *Id.*

## B. *Analysis*

■ The state-court decision in *Commonwealth v. Kibbe* is contrary to clearly established Supreme Court law in two respects. First, the Appeals Court of Massachusetts purports to apply the rule of *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) [hereinafter "*Charles*"]. The Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), however, controls petitioner's case and requires a contrary result. Second, the *Kibbe* decision applies the incorrect rule insofar as it relies on a previous Appeals Court case,

*Commonwealth v. McClary*, 33 Mass.App. Ct. 678, 604 N.E.2d 706 (Mass.App.Ct. 1992), which mischaracterized the holding of *Charles*. Judged against the background of existing precedent and the evidentiary record, the *Kibbe* decision also involves an unreasonable application of Supreme Court precedent established in *Doyle* and *Charles*. *O'Brien*, 145 F.3d at 25.

### 1. The *Kibbe* Decision is "Contrary to" Clearly Established Supreme Court Law

#### a. The Rule of *Doyle v. Ohio* is Clearly Established Supreme Court Law

The threshold question under AEDPA is whether Kibbe seeks to apply a rule of law that was clearly established at the time his state-court conviction became final. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). *Doyle v. Ohio* prohibits cross-examination and arguments to the jury regarding a defendant's post-*Miranda* silence.[14] 426 U.S.

---

13. This does not imply that there is no role for lower federal court precedent. Non–Supreme Court federal case law offers persuasive authority in applying Supreme Court law in connection with the "unreasonable application" test. *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir.1998) ("To the extent that inferior federal courts have decided factual similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue."); *Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir.2000) ("Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.') (quoting *MacFarlane v. Walter*, 179 F.3d 1131, 1139 (9th Cir. 1999)).

14. *Doyle* involved two petitioners who were arrested and given the warnings dictated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). 426 U.S. 610 at 612, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). After the arrest and reading of *Miranda* warnings, petitioner Wood remained completely silent about an alleged marijuana sale. *Id.* at

613–14, 96 S.Ct. 2240. Petitioner Doyle's comments to the narcotics agents after his arrest and receipt of *Miranda* warnings also did not discuss the offense at that time but merely commented, "What's this all about?" and "I don't know what you're talking about." *Id.* at 614 n. 5, 96 S.Ct. 2240. Doyle's comments (and an additional non-committal one mentioned in the Doyle dissent) were treated by all members of the Supreme Court as "post-arrest silence." *Id.* at 616, 96 S.Ct. 2240.

At their trials, Woods and Doyle told exculpatory stories. On cross-examination the prosecutor used each petitioner's post-arrest silence for impeachment purposes. The trial court overruled timely objections. Before the Ohio Court of Appeals, the petitioners unsuccessfully asserted that the trial court erred in allowing the prosecutor to cross-examine them about their post-arrest silence. *Id.* at 615–16, 96 S.Ct. 2240. The Supreme Court reversed the convictions, stating: "We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 619, 96 S.Ct. 2240.

610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The rule rests on the implicit assurance of the *Miranda* warning, "that silence will carry no penalty." *Id.* The Commonwealth cannot inform an arrestee of his right to remain silent, then, once relied on by the arrestee, use it against him in court. "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id. Doyle* qualifies as "clearly established Federal law" for purposes of AEDPA's "contrary to" analysis.[15]

The Commonwealth argues that *Doyle* is not controlling because Kibbe waived his right to remain silent. Unlike the defendants in *Doyle*, Kibbe made a post-*Miranda* statement to police about the crime. The Commonwealth argues that the controlling Supreme Court precedent is *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), and the Appeals Court agreed.[16]

In *Charles*, the defendant told police he stole a car from a street corner in a particular neighborhood. *Charles*, 447 U.S. at 405, 100 S.Ct. 2180. Charles then testified at trial that he stole the car from a different location, namely the parking lot near the jail where he was held awaiting trial. *Id.* at 405–06, 100 S.Ct. 2180. The first statement, given to police, flatly contradicted the second, given at trial. On cross examination, the prosecutor asked why the

---

**15.** The Supreme Court and lower federal courts have repeatedly emphasized the importance of *Miranda* rights, particularly as protected by *Doyle*. *See, e.g., Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405 (2000) (upholding *Miranda* against statutory challenge); *Brecht v. Abrahamson*, 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (emphasizing the importance of the due process protection afforded by *Doyle*); *United States v. Elkins*, 774 F.2d 530, 537 (1st Cir.1985) ("*Doyle* has been strictly applied so that any description of a defendant's silence following arrest and *Miranda* warning, whether made in the prosecutor's case in chief, on cross-examination, or in closing arguments, constitutes a violation of the Due Process Clause"). Nonetheless, *Doyle* has been criticized as "a questionable interpretation of the self-incrimination clause." *Phelps v. Duckworth*, 772 F.2d 1410, 1416 (7th Cir.1985) (Posner, J., concurring). In light of such criticism, the Supreme Court affirmed the importance of *Doyle* in *Brecht v. Abrahamson*:

[ ] *Doyle* was not simply a further extension of the *Miranda* prophylactic rule. Rather, as we have discussed, it is rooted in fundamental fairness and due process concerns. However real these concerns, *Doyle* does not " 'overprotec[t]' " them. Under the rationale of *Doyle*, due process is violated whenever the prosecution uses for impeachment purposes a defendant's post-*Miranda* silence. *Doyle* thus does not bear the hallmarks of a prophylactic rule.

507 U.S. at 629, 113 S.Ct. 1710.

**16.** At the hearing on this petition, the Commonwealth raised for the first time an additional theory to buttress the Appeals Court ruling: Kibbe's testimony that he answered all of the post-*Miranda* police questions "over and over again" created the false impression that Kibbe had fully cooperated with police. The Commonwealth argues that Kibbe did not fully cooperate because Kibbe omitted an important detail from his statements—he did not volunteer his reason for flight. It is true that the Commonwealth would be entitled to cross-examine Kibbe as to his post-*Miranda* silence on the issue of flight *if* his trial testimony conveyed the erroneous impression that he had answered all questions put to him, when in reality he had not. *Doyle v. Ohio*, 426 U.S. 610, 619 n. 11, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Grieco v. Hall*, 641 F.2d 1029, 1033 (1st Cir.1981). For example, if, on the night of the crime, the police had asked Kibbe his reason for fleeing and Kibbe had refused to answer, Kibbe could not use *Doyle* as a shield against impeachment if he testified at trial that he had provided the police with his reason for flight.

In this case, however, the Commonwealth's argument is fatally flawed: The Commonwealth did not produce *any* evidence that Kibbe misled the jury by failing to answer *any* of the questions put to him by the police. Quite to the contrary, Officer Witkowski testified that Kibbe answered all of the officers' questions. *See* Trial Trans. at 20. Even the Appeals Court found that Kibbe "answered police in full." Appeals Court Op. at 2. Nor did Kibbe deny his flight or claim to have told the police his reason for flight. He simply did not volunteer the information about why he fled. He was not required to do so.

defendant did not tell the same story at the time of the arrest. The prosecutor then pointed out that the defendant could see the parking lot from his cell window while he was being held in jail pending trial, suggesting a recently fabricated story. *Id.*

The *Charles* Court held that *Doyle* did not govern the facts of Charles' case. *Id.* at 409, 100 S.Ct. 2180. Where a defendant makes a post-*Miranda* statement on a particular subject, and then makes a second statement on that *same* subject at trial, a prosecutor can question a defendant about inconsistencies in the two statements. The Court wrote:

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that *merely* inquiries into prior *inconsistent* statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. *As to the subject matter of his statements*, the defendant has not remained silent at all.

*Id.* (emphasis added). The Court found that the prosecutor's questions in *Charles* "were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Charles*, 447 U.S. at 409, 100 S.Ct. 2180. Each of the two inconsistent descriptions of events involved "silence" only insofar as it omitted facts included in the other version.

What made the statements inconsistent is that they involved two different versions of the same episode. If a defendant speaks to the *same* subject matter after being read his *Miranda* warnings and at trial, the prosecutor is free to inquire into any arguable inconsistencies in those two

statements. Like *Doyle*, the *Charles* rule also qualifies as "clearly established Federal law" amenable to AEDPA's "contrary to" analysis.

## b. The Rule of *Anderson v. Charles* Never Applies When Trial Testimony Concerns a Different Subject Matter than the Subject Matter of the Post-*Miranda* Statement

■ In cases where a defendant remains silent as to a particular subject matter during post-*Miranda* questioning, *Doyle v. Ohio* prevents the prosecution from making use of post-arrest silence for impeachment purposes.[17] The rationale for this rule is that "*every* post-arrest silence is insolubly ambiguous" in light of the State's warnings. *Doyle*, 426 U.S. at 617, 96 S.Ct. 2240 (emphasis added). It suggests guilt *or* it suggest that the defendant has decided to stand on his Fifth Amendment rights. *See Brecht v. Abrahamson*, 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

*Doyle* covers a variety of factual scenarios where defendants remain silent, or only partially so, during post-*Miranda* questioning—where he is not asked about a given area, or he is asked but declines to answer. *See Doyle*, 426 U.S. at 617, 96 S.Ct. 2240; *Brecht*, 507 U.S. at 628–29, 113 S.Ct. 1710. The *Charles* rule, on the other hand, is only triggered when the defendant's trial testimony addresses the same subject matter as the defendant's post-arrest statement and the two statements are arguably inconsistent. *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). Where a defendant's testimony at trial deals with a subject matter not addressed in his post-arrest statement, there can be no inconsistency. *Charles* is inapplicable.[18]

---

17. This holds true so long as the defendant's testimony does not create a false impression of full cooperation with authorities. *Doyle*, 426 U.S. at 619 n. 11, 96 S.Ct. 2240; *Grieco*, 641 F.2d at 1033.

18. For cogent statements of the relationship between *Doyle* and *Charles*, see *Pitts v. Anderson*, 122 F.3d 275, 279–81 (5th Cir. 1997), *Bass v. Nix*, 909 F.2d 297, 302–04 (8th

### c. *Doyle* Governs Kibbe's Claim Because Kibbe's Trial Testimony Regarding the Collateral Subject of his Flight Did Not Contradict his "Brief" Post–Arrest Statement

Kibbe provided a statement to police regarding his reasons for being in the area of the abandoned building. He specifically denied setting the fire. He did not remain silent as to the subject matter of the offense or his excuse for being in proximity to the fire. One of the arresting officers, Officer Witkowski, testified in relevant part:

[Counsel]     And at that point you had a conversation with [Kibbe]; is that correct?

[Witkowski]     *A brief conversation.*

Counsel]     Regarding that incident? Regarding the incident; is that correct?

[Witkowski]     *Regarding his reason for being in the area,* yes.

[Counsel]     And he answered your questions?

[Witkowski]     Yes, sir.

[Counsel]     And he told you why he was in the area?

          *   *   *

[Witkowski]     Yes, sir.

Trial Trans. at 20–21 (emphasis added).

At no point does the record disclose that this "brief conversation" involved questioning regarding Kibbe's flight, nor does the record indicate that Kibbe volunteered an explanation for his flight prior to trial. Essentially, Kibbe remained silent as to this collateral subject during post-*Miranda* questioning.[19]

> Cir.1990), and *United States v. Casamento,* 887 F.2d 1141, 1179 (2d Cir.1989).
>
>    The civil analog is this: A witness is not asked about a particular subject during a deposition. At trial, he testifies about that area. Plainly, there is no prior inconsistent statement here under the rules of evidence.
>
> **19.** At the hearing on this petition, the Commonwealth conceded that had police asked Kibbe about the collateral subject of his flight, Kibbe could have asserted his right to remain silent as to that subject matter. This concession supports the Court's view that the subject

Kibbe may have had valid reasons for remaining silent as to this issue during post-*Miranda* questioning. First, informing the police of his parole status would only have increased the chances that police would view him as the primary suspect in the arson investigation. Second, as a parole, Kibbe could be subjected to separate parole revocation proceedings for the conduct underlying the offense charged. As such, Kibbe's statements, addressing two distinct subject matters, are entirely consistent—one addresses his reason for being at the scene of the fire (i.e., to urinate in the yard), while the other explains his reason for fleeing the police (i.e., because he was on parole).

Put otherwise, *Charles* is implicated where a defendant says "X" to the police and "not X" at trial, not where a defendant says "X" to the police and "Y," an entirely different subject matter, at trial.

I find that *Doyle* squarely governs the petitioner's claim. Because the prosecutor's cross-examination and closing argument discredited Kibbe's trial testimony by impermissibly drawing attention to Kibbe's post-arrest silence concerning his reason for flight, the questions and comments violated *Doyle.* The Appeals Court of Massachusetts applied the wrong rule, *Anderson v. Charles.* The Appeals Court decision, therefore, is contrary to clearly established Supreme Court law.

### d. The *Kibbe* Court Also Misstated the Rule of *Anderson v. Charles*

In *Kibbe,* the Appeals Court relied on its earlier decision in *Commonwealth v.*

> of Kibbe's flight is distinct from the subject of his alibi for being in the area of the fire. Moreover, the Commonwealth's position acknowledges that *Miranda* and *Doyle* protect Kibbe even though he remained only partially silent. *Grieco v. Hall,* 641 F.2d 1029, 1034 (1st Cir.1981) ("*Miranda* protections apply equally to refusals to answer specific questions."); *Booton v. Hanauer,* 541 F.2d 296, 298–99 (1st Cir.1976) (finding constitutional error where prosecutor introduced evidence of petitioner's refusal to answer specific questions during a police interview).

*McClary*, which purported to follow *Anderson v. Charles.* 33 Mass.App.Ct. 678, 685, 604 N.E.2d 706, 710 (Mass.App. Ct.1992). That reliance is misplaced: The *McClary* case appears, at the very least, to have diluted the inconsistency requirement of *Charles.* Thus, the *Kibbe* decision is contrary to clearly established Supreme Court law in a second respect insofar as it misconstrues *Charles* and identifies the "wrong" rule.[20] *See* Appeals Court Op. at 2–3.

In *McClary*, the police seized substantial quantities of cocaine and marijuana from the defendant's home pursuant to a search warrant. They subsequently arrested McClary and read him his *Miranda* rights. A police officer testified that the following exchange took place thereafter:

> I questioned him about the drugs, the cocaine and the marijuana, at which point he said that he didn't want to say too much. He didn't want to implicate himself too much, but that, as I recall, he stated, 'You found all the drugs that I've got here. This is it. This is all the drugs. You're wasting your time if you look any further.'

*McClary*, 33 Mass.App.Ct. at 679, 604 N.E.2d 706. The defendant then testified at trial that while the marijuana and drug paraphernalia found in his home belonged to him, the cocaine belonged to a friend. The prosecutor cross-examined McClary as to his failure to tell the police that the cocaine belonged to another person, and later argued to the jury that the friend's "name doesn't come up" on the day McClary was arrested. *Id.*, 33 Mass.App. Ct. at 681–82, 604 N.E.2d at 708.

On appeal, McClary argued that the prosecutor violated *Doyle.* In rejecting that argument, the *McClary* court did not explicitly discuss whether McClary's post-arrest statement—apparently taking responsibility for all the drugs in his home—was inconsistent with his trial testimony—which attributed some of the drugs to a friend. Instead, the court appears to have conducted what can only be described as a loose waiver analysis. The *McClary* court found that "the key to admitting in evidence the defendant's pretrial omission in his statement to the police is that there was no evidence of the defendant's silence in the face of post-arrest post-*Miranda* questioning." *Id.*, 33 Mass.App.Ct. at 686, 604 N.E.2d at 710. The court concluded that the defendant "waived his *Miranda* rights and responded to police questioning" so it was not improper for the prosecutor to question the defendant and comment to the jury on the failure of the defendant to mention his friend's ownership of the cocaine. *Id.*

To be sure, had the *McClary* court chosen to explicitly conduct the inconsistency analysis required by *Charles*,[21] the court probably would have reached the same conclusion. Defendant's statements were arguably inconsistent.[22] The breadth of

---

**20.** In *Williams v. Taylor,* the Supreme Court treated a misstatement of the *Strickland* ineffective assistance of counsel rule as *both* contrary to, and an unreasonable application of, clearly established federal law. *Williams,* 529 U.S. 362, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000).

**21.** The *Charles* Court never suggested that when a defendant remains only partially silent he has waived his right to remain silent altogether, as to all issues. *See Anderson v. Charles,* 447 U.S. 404, 408–09, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). To do so would be to swallow up the *Doyle* rule in the exception. Rather, the Court only approved of trial questions "designed . . . to elicit an explanation for a prior inconsistent statement." *Id.*

at 409, 100 S.Ct. 2180. By definition, *Charles* applies only when the defendant has spoken to the *same* subject matter in both his post-arrest statement and at trial.

**22.** That is, McClary spoke to the same subject matter—possession of the drugs—in both statements. Before trial, he tells the police they have "found all the drugs that I've got here," essentially admitting his possession of all the drugs found. At trial, he then denies possession of some of the drugs.

In 1995, the First Circuit cited *Anderson v. Charles* in affirming the summary dismissal of McClary's federal habeas petition. *McClary v. Pepe,* 69 F.3d 531, No. 94–2294, 1995 WL 660953 (1st Cir. Nov.9, 1995). The First Cir-

the language in *McClary*, however, opened the door to questioning and comments by the prosecutor with respect to *any* subject matter, regardless of actual or potential inconsistency, whenever the defendant makes a post-arrest statement regarding the crime.

This is not the rule of *Anderson v. Charles*. The *Charles* case only authorizes a prosecutor to ask questions about post-*Miranda* omissions when those omissions are on the same topic as the trial testimony and arguably contradict it. Insofar as the *Kibbe* court misinterpreted the rule of *Charles* by seizing upon *McClary*'s waiver analysis, the *Kibbe* decision is "contrary to" clearly established federal law.

### 2. The *Kibbe* Decision Involves an Unreasonable Application of Clearly Established Supreme Court Law

Under *Williams v. Taylor*, the Appeals Court's application of the *Doyle–Charles* principles will not be disturbed if the decision is simply incorrect or erroneous, but

only if it is both erroneous and unreasonable.[23] *Williams*, 529 U.S. 362, 120 S.Ct. 1495, 1522, 146 L.Ed.2d 389 (2000). I first address the absence of record support for the state decision, and then the existing federal precedent.

#### a. The *Kibbe* Court's Attempted Application of *Anderson v. Charles* Is Devoid of Record Support

The Appeals Court described the application of the *Charles* rule to Kibbe's facts in the following language: "Here the defendant, after being told of his rights, spoke to the police in detail about all matters concerning the charge for which he was arrested, and thus the prosecutor was entitled to ask the defendant about his failure to mention to the police that the reason for his flight. . . ." Appeals Court Op. at 3.

To the contrary, Kibbe did not speak to the police about *all* matters.[24] Answering questions about one's alibi (i.e., where one was and what one was doing during the commission of the crime) does not equate

---

cuit's decision is not contrary to my analysis since McClary's post-arrest statements were arguably inconsistent with his trial testimony and, therefore, fell squarely within the rule of *Charles*. The First Circuit also found that any *Doyle* error in *McClary* was harmless considering the strength of the evidence. *Id.*, 69 F.3d 531, 1995 WL 660953, at *1.

**23.** The Supreme Court's analysis in *Williams* is instructive here. There, the Court found a Virginia Supreme Court decision both contrary to, and involved an unreasonable application of, the Court's clearly established precedent. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000). First, the Court found that the Virginia court erred in holding that the Supreme Court's decision in *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), modified or supplanted the rule set down in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In that regard, the state-court decision was "contrary to" established Supreme Court law in *Strickland*. *Id.* at 1513. Second, the *Williams* Court found that the Virginia Supreme Court's prejudice determination under *Strickland* was unreasonable in at least two respects. The

state-court decision was unreasonable insofar as it turned on the erroneous view that a "mere" difference in outcome is not sufficient to establish constitutionally ineffective assistance of counsel. *Id.* at 1515. The Virginia decision also involved an unreasonable application of *Strickland* "insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Id.* The Virginia court, then, unreasonably applied *Strickland*'s prejudice prong by ignoring a portion of the underlying record.

**24.** To the extent that the statement, "[Kibbe] spoke to the police in detail about all matters concerning the charge for which he was arrested," involves a determination of fact (as opposed to an application of law to facts), the Appeals Court's determination is clearly unreasonable. Thus, the Appeals Court decision might be viewed as being "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Court declines to fully develop this independent basis for granting habeas relief here.

to answering questions about the collateral subject of why one fled from police. Under these circumstances, the *Kibbe* court was justified in finding that Kibbe waived his right to remain silent with respect to *some* matters, but not with respect to *all* matters.

### b. The *Kibbe* Decision Is Offensive to Existing Federal Precedent

I am entitled to consider lower federal court decisions resolving factually similar cases as persuasive authority on the reasonableness of the *Kibbe* decision.[25] *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir.1998); *Tuan Van Tran v. Gary Lindsey*, 212 F.3d 1143, 1154 (9th Cir.2000). A series of federal circuit cases decided prior to *Kibbe* are in accord with this Court's reading of the *Doyle–Charles* framework.

In *Grieco v. Hall*, 641 F.2d 1029 (1st Cir.1981), which includes dicta on which the respondent relies, the defendant was arrested for armed assault in a dwelling and larceny of a motor vehicle.[26] Police read him *Miranda* warnings. *Grieco*, 641 F.2d at 1031. Upon arrest, he initially refused to make a statement. At the police station, the police confronted Grieco with the owner of the van used as the getaway vehicle. Grieco stated that he did not know the owner and that he (Grieco) was a hitchhiker. *Id.*

Grieco then took the stand at trial and presented an exculpatory version of the incident. Grieco claimed that he had been drinking with a now deceased friend the evening of his arrest. Grieco testified that when his friend stopped the car to go into a nearby building for some unknown reason, Grieco walked to an alley to urinate. At that moment, Grieco claimed he saw a van drive around the corner of the alley and two men run from the van into the woods. Minutes later police arrived and arrested the defendant as he was walking past the van. *Id.*

The prosecutor then questioned the defendant as to the differences between his post-*Miranda* story that he was a hitchhiker and his trial testimony that he was out drinking and driving with a friend. During closing arguments, the prosecutor also emphasized the defendant's failure to tell his latter story to police. *Id.* at 1032.

The First Circuit upheld the district court's denial of the writ of habeas corpus citing *Anderson v. Charles*. *Grieco*, 641 F.2d at 1036. The court found that "Grieco's exculpatory trial story clearly was inconsistent with his post-arrest statement that he was a hitchhiker." *Id.* "When a defendant elects to make post-arrest statements and later contradicts them, the prosecutor may 'challenge him with those statements and with the fact that he withheld his alibi from them.'" *Id.* at 1035. The court had no occasion to decide whether to adopt a more expansive interpretation of *Charles* because the case fell squarely within the Supreme Court's holding in *Charles*.[27]

25. The Court considers existing precedent to include cases published prior to March 1995, the date of the *Kibbe* decision.

26. A pre-*Charles* First Circuit case, *United States v. Goldman*, 563 F.2d 501 (1st Cir. 1977), does appear to apply a waiver analysis in a case where the defendant did not answer specific questions. However, *Goldman* does not lend weight to the respondent's position for two reasons. First, the Supreme Court's decision in *Charles* supersedes *Goldman*, and *Charles* does not focus on the waiver question. Second, the First Circuit's waiver analysis in *Goldman* was much more rigorous than that found in *Kibbe*. The First Circuit explicitly found that the defendant actually waived his right to remain silent as to specific questions that were asked by the FBI. *Goldman*, 563 F.2d at 504. The court held that "on the basis of the record" Goldman "thought he did answer the question" and that the failure to answer was not a reassertion of rights in that particular case. *Id.* In *Kibbe*, the state court overlooked the fact that the record did not show that police had questioned Kibbe regarding his flight, nor did the court analyze whether Kibbe asserted his *Miranda* rights with respect to his parole status. Appeals Court Op. at 3.

27. The First Circuit considered a pre-*Charles* Fifth Circuit case, *United States v. Beechum*, which adopted a view that closely resembles

Significantly, the First Circuit rejected the loose waiver analysis exemplified by *Kibbe* : "This does not mean that any time a defendant makes any post-arrest statement the door is open to full cross-examination about the defendant's failure to recount the exculpatory trial story earlier. *Miranda* protections apply equally to refusals to answer specific questions." *Id.* at 1034. The *Grieco* decision, therefore, preserved the vitality of *Doyle* in instances of partial silence.

Federal circuit case law subsequent to *Grieco* unanimously follows the First Circuit's lead.[28] In *United States v. Laury*, the First Circuit addressed facts similar to those presented here. 985 F.2d 1293, 1301–02 (5th Cir.1993). In response to FBI agents' questions during a robbery investigation, Laury made several post-arrest statements explaining his recent large expenditures of cash and where he had received the money. Laury did not discuss his whereabouts on the date of the robbery with the agents. *Id.* at 1303. Nothing Laury told the agents was incon- ·

sistent with his trial testimony that he was at a party on the date of the bank robbery. The prosecutor then commented not on what Laury told the agents, but on what he did not tell them. *Id.* The court noted that "[j]urors would naturally and necessarily view the prosecutor's line of questioning on cross-examination, as well as his statement in closing argument, as an attack on Laury's credibility." *Id.*

Because Laury's post-arrest and trial statements were not inconsistent, the Fifth Circuit viewed the prosecutor's remarks "as comments on Laury's post-arrest silence, and therefore in violation of *Doyle*." *Id.* at 1303–04. The Fifth Circuit squarely rejected the government's contention that Laury had somehow waived this protection because he did not remain completely silent following his arrest:

> We do not believe, however, that the Supreme Court in *Doyle* intended that a defendant remain completely silent following arrest in order to rely on the protection of the due process clause. In fact, the Court in *Doyle* did not treat the

that advocated by respondent and the *Kibbe* court. *See* 582 F.2d 898, 906 (5th Cir.1978). In *Beechum*, the defendant's post-arrest statements were not inconsistent with his exculpatory trial testimony. *Id.* at 904–05. The First Circuit viewed *Beechum* as an expansion of the *Charles* rationale "to apply to a situation where the defendant has not maintained silence after arrest, but has made exculpatory post-arrest statements which are not themselves inconsistent with the exculpatory trial story, but which relate to a different subject matter." *Grieco*, 641 F.2d at 1036. In light of the Supreme Court's more restrictive holding in *Charles*, the *Grieco* court *did not* adopt *Beechum* and has never adopted a similar rule. The Fifth Circuit itself implicitly repudiated the reasoning of *Beechum* in *United States v. Laury*, 985 F.2d 1293, 1303–04 (5th Cir.1993) (holding that prosecutor's comments violated *Doyle* as there was no inconsistency between post-arrest and trial statements).

**28.** Since *Charles* was decided, virtually every federal circuit court decision upholding a prosecutor's questions and comments on a defendant's post-*Miranda* silence focused on the key issue—the *inconsistency* of the defendant's statements regarding the same subject.

*See Grieco v. Hall*, 641 F.2d 1029, 1036 (1st Cir.1981); *Pitts v. Anderson*, 122 F.3d 275, 282 (5th Cir.1997) ("Because the statements concern the same subject matter and are arguably inconsistent, the prosecutor's questions and comments regarding Pitt's failure to include facts supporting the accidental nature of the shooting in his post-arrest statement do not violate *Doyle*."); *Smith v. Cadagin*, 902 F.2d 553, 559 (7th Cir.1990) ("The prosecutor's cross-examination was limited to the defendant's earlier description of the encounter . . . and an attempt to demonstrate an 'arguable inconsistency' in the defendant's account."); *Phelps v. Duckworth*, 772 F.2d 1410, 1412 (7th Cir.1985) ("[A]s we read the record, Phelps told two different stories."); *United States v. Schultz*, 698 F.2d 365, 367 (8th Cir.1983) (holding cross-examination proper with respect to defendant's prior, arguably inconsistent statement); *Hockenbury v. Sowders*, 718 F.2d 155, 159 (6th Cir.1983); *United States v. Ochoa-Sanchez*, 676 F.2d 1283, 1286–87 (9th Cir.1982) ("The trial transcript reveals that defendant's version of the events of his trip . . . is quite different from the version he proposed . . . upon his arrest"). These courts did not conduct an over-simplified waiver analysis.

defendant's post-arrest comments as a waiver of his right to remain silent. That Laury did not remain completely silent following his arrest did not give the prosecutor unbridled freedom to impeach Laury by commenting on what he did not say following his arrest.

*Laury*, 985 F.2d at 1304 n. 10 (citations omitted). The court then concluded that, in light of the evidence of Laury's guilt, the improper prosecutorial comments did not constitute plain error. *Id.* at 1304.

Prior to *Laury*, the Tenth Circuit interpreted *Charles* and *Doyle* under similar circumstances. In *United States v. Canterbury*, the defendant, like Kibbe, voluntarily spoke with the police post-*Miranda*, but omitted information which he later disclosed while testifying. 985 F.2d 483, 484–85 (10th Cir.1993). The defendant was charged with possession of an unregistered firearm. He had loaned a friend, Steven Enrici, a sum of money which Enrici refused to pay. Enrici went to the police claiming that Canterbury had threatened him over the debt. In the course of the interview, Enrici indicated that Canterbury had asked him about acquiring a silencer, in partial payment of the debt. The police set up a sting, with an undercover officer posing as someone who made silencers. After some negotiations, the officer handed Canterbury a silencer and Canterbury was arrested. *Id.* at 484.

After receiving *Miranda* warnings, the defendant made three statements, each in response to a police question. The detective asked Canterbury whether Canterbury had any more silencers, and the answer was no. *Id.* at 484–85. Next, Canterbury admitted buying the silencer in question. Finally, when asked why he needed a silencer, Canterbury responded "for protection." [29] *Id.* at 485.

At trial Canterbury raised an entrapment defense. He claimed that Enrici told him the only way Enrici could repay the debt was to provide Canterbury with a silencer; the Canterbury was not interested at first; but Canterbury finally decided to accept the silencer as a last resort. *Id.*

The *Doyle–Charles* rule, according to the Tenth Circuit, raised the question of "whether the cross examination was designed to impeach the defendant's trial testimony by calling attention to prior inconsistent statements or, instead, was designed to suggest an inference of guilt from the defendant's post-arrest silence." *Canterbury*, 985 F.2d at 486. The court found the latter. It concluded that the entrapment defense raised issues that were different from, and not inconsistent with, the statements made by the defendant in the police interview.[30] Accordingly, the court found a *Doyle* violation and granted a new trial. *See id.* at 486–87.

In *Bass v. Nix*, the Eighth Circuit applied the same analysis. *See* 909 F.2d 297, 302 (8th Cir.1990). Upon his arrest for the murder of his friend and longtime partner in crime, authorities read Bass his *Miranda* rights and escorted him from California to Iowa. *See id.* at 299 n. 5. During the trip, Bass spoke to the officers about the murder but did not offer any exculpatory or inculpatory explanation at that time. *See id.* At trial, Bass testified as to his whereabouts at the time of the murder and provided a thorough exculpatory story, including his theory that his friend had been murdered by other criminals to whom his friend had been trying to sell stolen goods. *See id.* at 299 n. 4. The prosecutor then cross-examined Bass as to his failure to tell this exculpatory story at any point prior to trial. The prosecutor also argued that the defendant's story was "ridiculous" in light of the defendant's post-arrest silence. *Id.* at 300.

---

**29.** On the stand, Canterbury denied making this last statement.

**30.** Just as in Kibbe's case, Canterbury said "X" during his police interview, and "Y" at

trial. Neither *Kibbe* nor *Canterbury* presented the typical *Charles* fact pattern where the defendant said "X" during post-arrest questioning, and "not X" at trial.

The jury returned a verdict of guilty of first-degree murder. *Bass*, 909 F.2d at 300. The Iowa Supreme Court affirmed the conviction, finding no *Doyle* violation. On habeas, the district court granted Bass' petition. The Eighth Circuit agreed, concluding that the facts of *Bass* were "controlled by *Doyle*." *Id.* at 302. The court found that the prosecutor's questions were designed, and so functioned, to impeach Bass' trial testimony by reference to his post-arrest silence: "The prosecutor did not refer to any prior inconsistent statements at that point, or at any later point in his cross-examination. Moreover, the record indicates that Bass made no prior inconsistent statements that could have impeached his trial testimony." *Id.* There also were no omissions from what statements Bass did make that conflicted with his trial testimony.[31] *See id.* at 304. The court affirmed the grant of habeas relief since the *Doyle* error was not harmless in the context of the record.[32] *Id.* at 305.

Finally, the Second Circuit also resolved the question presented by the instant case like its sister circuits. In *United States v. Casamento*, defendant Mazzurco was arrested and informed of his constitutional rights. 887 F.2d 1141, 1179 (2d Cir.1989). FBI agents questioned him regarding his connections to a co-defendant, Alfano, involved in the narcotics conspiracy. Mazzurco admitted to the agents that he knew Alfano and that the previous year he and Alfano had considered buying a pizzeria together. *Id.* During his direct examination, Mazzurco testified that he was in the business of importing precious stones. On cross-examination, the prosecutor asked whether the defendant had, at the time of

his arrest, told agents that he was "dealing precious stones with Mr. Alfano?" and the defendant answered in the negative. *Id.* The defendant argued *Doyle* on appeal.

Second Circuit rejected the government's contention that *Anderson v. Charles* applied. *Id.* The court stated:

It is evident to us that [*Charles*] does not apply here since Mazzurco's statement to the FBI agents and his testimony during direct examination were not inconsistent. It is logically consistent that Mazzurco could have known Alfano and considered buying a pizzeria with him and, concurrently, could have been in the business of importing precious stones.

By making a post-arrest statement about Alfano, Mazzurco did not open the door to any and all questions about Alfano the government might have cared to ask him during cross-examination. Indeed, for purposes of analysis under *Doyle*, even if a defendant has made statements to the police after receiving *Miranda* warnings, he is deemed to have maintained his silence, unless the post-arrest statements are inconsistent with the defendant's testimony at trial. *Id.* While the court concluded that the district court had violated Mazzurco's due process rights; it held that the error was harmless because, unlike the present case, the prosecutor did not make a point of Mazzurco's silence to the jury and the evidence of Mazzurco's guilt was strong. *See Casamento*, 887 F.2d at 1180.

These cases demonstrate that the *Kibbe* decision runs directly contrary to existing

---

**31.** Of special note to the present case, the Eighth Circuit explicitly ruled that the Iowa Supreme Court had erred in conducting a waiver analysis in these circumstances. *Bass* 909 F.2d at 304. The court wrote: "[T]he Supreme Court has never applied the waiver doctrine to a *Doyle* violation. The key to the inquiry has always been whether the impeachment was based on post-arrest statements contradicting later trial testimony or

whether the impeachment was based on silence contradicting later trial testimony." *Id. Kibbe* presents an example of the latter, and like *Bass*, is controlled by *Doyle*.

**32.** In *Brecht v. Abrahamson*, the Supreme Court rejected the *Bass* court's application of the *Chapman* "harmless-beyond-a-reasonable-doubt" standard to *Doyle* violations. *See* 507 U.S. 619, 627 n. 3, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

federal precedent applying *Charles*. Thus, I conclude not only that Kibbe has the better of two reasonable legal arguments. Rather, I am firmly convinced that error occurred and that the *Kibbe* decision is an unreasonable outcome. The remaining question is harmless error.

### C. *HARMLESS ERROR*

After conducting a *de novo* review of the trial record, I find that the *Doyle* errors were not harmless in this case.

#### 1. *Standard of Review*

■ The standard for determining whether habeas relief must be granted is whether the *Doyle* error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).[33]

■ The reviewing court must examine the trial record *de novo* in order to apply the *Kotteakos* standard properly. *Id.* at 642, 113 S.Ct. 1710 (Stevens, J., concurring).

Justice Stevens elaborated on the *Kotteakos* standard in his concurring opinion, writing:

> The habeas court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place. *Kotteakos* is full of warnings to avoid that result. It requires a reviewing court to decide that 'the error did not influence the jury,' and that 'the judgment was not substantially swayed by the error.'

*Id.* (citations omitted). The petitioner does not have to show that *but for* the error, he would have been acquitted. The error does not have to be outcome-determinative. Rather, the error must have had a "substantial and injurious" impact on the jury's decision.

#### 2. *Analysis*

■ The key factors in determining whether a *Doyle* violation is harmless are: (1) The use to which the prosecution put the post-arrest silence; (2) whether the government made repeated *Doyle* violations; (3) whether any curative effort was made by the trial court; (4) whether the defendant's exculpatory evidence is transparently frivolous; and, (5) whether the other evidence of the defendant's guilt is overwhelming. *See Brecht*, 507 U.S. at 638–39, 113 S.Ct. 1710; *United States v. Canterbury*, 985 F.2d 483, 487 (10th Cir. 1993); *Bass v. Nix*, 909 F.2d 297, 305 (8th Cir.1990); *United States v. Casamento*, 887 F.2d 1141, 1180 (2d Cir.1989). In this case a *de novo* review of the trial transcripts indicates that these factors weigh heavily in favor of petitioner.

First, the prosecution used the petitioner's post-arrest silence to attack the heart of Kibbe's defense—his credibility. Kibbe did not dispute that a fire had been deliberately set in the abandoned home. Instead, Kibbe claimed an unknown individual started the fire before Kibbe arrived. Kibbe's defense consisted of his own testimony and the testimony of one of the State's witnesses, a fire inspector who described a similar fire that had been set in the building by another individual six days after the fire with which Kibbe was charged.

The jury could have acquitted Kibbe if and only if they believed his story that he had been walking around the neighborhood smoking his pipe before he noticed the fire. The most damaging evidence against Kibbe, and perhaps the biggest obstacle to persuading the jury, was the fact of his flight from police. Almost certainly, the jury would have to believe Kibbe that his flight was explained by his parole status before they would acquit. The prosecutor's cross-examination did not

**33.** *Doyle* errors are considered trial errors, as opposed to structural errors, and may be quantitatively compared to other evidence to determine the effect the error had on the trial.

uncover any inconsistencies in Kibbe's exculpatory statements, so the prosecutor focused on Kibbe's silence to unravel the defense. During closing arguments, the prosecutor zeroed in on Kibbe's flight and the fact that Kibbe did not give his "fanciful" explanation to police. The *Doyle* violation was used to destroy the lynchpin of Kibbe's defense.

Second, the prosecutor made repeated *Doyle* violations by asking Kibbe two questions about his post-arrest silence at the close of cross-examination and by emphasizing Kibbe's post-arrest silence during closing arguments. The unconstitutional cross-examination questions were delivered in the most conspicuous manner. After the Commonwealth's attorney indicated that he had no further cross-examination questions, he then had second thoughts and asked the improper questions:

| [Prosecutor] | Do you like fire? |
|---|---|
| [Kibbe] | No. |
| [Prosecutor] | That is all that I have. I'm sorry. You didn't tell the police that you ran because you were on parole, right? |
| [Kibbe] | No, I did not. |
| [Prosecutor] | You never told them why you ran? |
| [Kibbe] | I don't believe I did. |
| [Prosecutor] | Nothing further. |

It is especially significant that these improper questions were the last questions asked of any witness at the short trial. They were not isolated, buried, and otherwise lost in a 900–page transcript at a four-day trial as were the *Doyle* violations

in *Brecht v. Abrahamson.* *Brecht,* 507 U.S. at 639, 113 S.Ct. 1710. The evidence phase of Kibbe's trial, in contrast to *Brecht,* lasted only a few hours.[34] As the last questions heard by the jury, they were much more likely to be influential in their deliberations.

Moreover, the improper closing remarks focused the jury's attention even further. The closing argument, which spans a mere six and one-half pages, was directed at Kibbe's credibility. Kibbe's flight was a central part of it. It is likely the remarks were fresh in the jurors' minds during deliberation.

Third, there was no curative instruction.[35] The prosecutor's attempt to draw a negative inference from Kibbe's silence was allowed to stand on its own.

Fourth, Kibbe's exculpatory evidence against him was not insignificant, much of it supported Kibbe's testimony. He had no motive. He lived in the neighborhood where the fire occurred. He claimed to be walking through the neighborhood so he could smoke his pipe. When he was arrested, the police found a pipe and pipe tobacco on his person. The presence of matches on his person could be explained by his smoking habit. Kibbe maintained essentially the same exculpatory story from the time of his arrest until the time of his trial.

Moreover, a fire inspector testified that a similar fire was in the building less than one week after the fire underlying Kibbe's conviction.[36] Kibbe could not have set this second fire. If Kibbe were innocently

---

**34.** The trial, including jury selection and side bar arguments, lasted approximately two hours on June 9, 1992, and approximately three and one-half hours on June 10, 1992. The complete transcripts consist of only 216 pages, all aspects of the trial included.

**35.** A curative instruction is not sufficient to cure repeated *Doyle* violations in any event. *Morgan v. Hall,* 569 F.2d 1161, 1168 (1st Cir.1978) ("In no case has a prompt and forceful instruction alone been held sufficient to vitiate the use of post-arrest silence").

**36.** Both fires occurred within one week of each other—the first on November 19 (the one underlying Kibbe's conviction) and the second on November 26. Both were started by holding an open flame, such as a match, to debris that were located within the abandoned building. The fire inspector testified that this method of setting fires is the most common. The first was set in the cellar, and the second was set in the attic. Kibbe could not possibly have set the second fire as he was being held in jail pending trial. A juvenile run-away was the primary suspect in the second fire, but he did not testify at trial.

caught in the wrong place at the wrong time because another individual actually had started the fire, his flight could be explained by his realization that his parole status would make him the primary suspect. If the jury credited Kibbe's testimony, it could have acquitted him of the charge by either, a) finding there was reasonable doubt that Kibbe set the fire, or b) actually believing another individual set the fire.

Fifth, and finally, the evidence against Kibbe was not overwhelming. Given the length of the trial, a change in one or two pieces of evidence could have had a substantial impact on the outcome.

Here are the facts weighed against Kibbe: 1) Kibbe was near the building some time after smoke was seen spilling from the building; 2) Kibbe did not contact neighbors to call the fire department; 3) Kibbe ran from the scene when police arrived; 4) police found a flashlight on Kibbe and the building did not have electricity; 5) police found paper towels on Kibbe and near the entrance to the building's cellar; 6) police found matches on Kibbe and fire inspectors found a burned matchbook among the debris; and, 7) Kibbe appeared to smell of smoke and have some soot on his face and jacket at the time of his arrest.

However, there was no eye witness testimony establishing that Kibbe actually entered the building or started the fire. Nor was there any circumstantial evidence, such as fingerprints, establishing that Kibbe had even been in the cellar of the building. A neighbor testified that he saw Kibbe walk to the end of the driveway and listen for sirens. It was night; Kibbe lived in the area. There was no soot on Kibbe's jacket when the Commonwealth produced the jacket as an exhibit at trial. The appearance of soot on Kibbe's face could be explained by the fact that he stumbled and fell on his face as he ran through the woods to evade police. The testimony established that the entire neighborhood smelled of smoke by the time of Kibbe's arrest, which could explain why the officers thought Kibbe smelled like smoke. Viewing the evidence in the record as a whole, I cannot characterize the Commonwealth's case as overwhelming.

My review of the transcript and all of the relevant "harmless error" factors discussed above lead me to conclude that the *Doyle* violations "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710. I hold, therefore, that the errors were not harmless.

### III. *CLAIM TWO—SHIFTING THE BURDEN OF PROOF*

█ Kibbe's second claim asserts that the prosecutor improperly shifted the burden of proof during closing argument thereby violating his Fourteenth Amendment right to due process, and that this error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. At trial, Kibbe testified in his own defense. In closing argument the prosecutor remarked: "If you don't believe what Mark Kibbe said, Mark Kibbe is guilty." Kibbe asserts that this remark impermissibly shifted the burden of proof and is not harmless error.

The Appeals Court found error, but concluded that the error was harmless in the context of the jury instructions. The Appeals Court characterized the judge's instructions as "sufficiently emphatic and comprehensive regarding the burden of proof." Appeals Court Op. at 4.

I agree that, taken alone in the context of the trial record, the error was harmless. Taken together with the *Doyle* violations, however, the prosecutor's burden-shifting error reinforces my conviction that the *Doyle* errors at Kibbe's trial " 'had a substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750,

776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). As with the *Doyle* errors, this second constitutional error was aimed at destroying Kibbe's credibility, and his credibility was the heart of his defense.

## IV. *CONCLUSION*

I find that the prosecutor's improper burden-shifting remark, taken alone, did not cast doubt on the integrity of the jury's verdict. However, I also hold that the Appeals Court rendered a decision that is both contrary to, and involves an unreasonable application of, clearly established federal law relating to Kibbe's post-*Miranda* silence. *See* 28 U.S.C. § 2254(d)(1). My *de novo* review of the trial transcripts reveals that the prosecutor's questions and comments in violation of *Doyle v. Ohio* were not harmless. For the reasons stated above, Mark Kibbe's petition for the writ of habeas corpus is **GRANTED.**

**SO ORDERED.**